UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 99-2201
(CA-98-169-7-F)

John Bruce Bradford,

                              Plaintiff - Appellant,

        versus

Rockwell Semiconductor Systems, Incorporated,

                              Defendant - Appellee.

O R D E R

        The court amends its opinion filed January 22, 2001, as follows:

        On the cover sheet, section 7, line 1 -- counsel's name is corrected to read "Kristen Gardner Lingo."

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                                      Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

JOHN BRUCE BRADFORD,
Plaintiff-Appellant,

v.

ROCKWELL SEMICONDUCTOR SYSTEMS,
INCORPORATED,
Defendant-Appellee.

No. 99-2201

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
James C. Fox, District Judge.
(CA-98-169-7-F)

Argued: December 4, 2000

Decided: January 22, 2001

Before NIEMEYER, WILLIAMS, and TRAXLER, Circuit Judges.

_____

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Jude Niemeyer and Judge Traxler joined.

_____

COUNSEL

**ARGUED:** Kristen Gardner Lingo, MANNING, FULTON & SKIN-
NER, P.A., Raleigh, North Carolina, for Appellant. Curtis Lee Mack,
MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Atlanta, Geor-
gia, for Appellee. **ON BRIEF:** David B. Kahng, MCGUIRE,
WOODS, BATTLE & BOOTHE, L.L.P., Atlanta, Georgia, for
Appellee.

_____

## OPINION

WILLIAMS, Circuit Judge:

John Bradford first filed for arbitration and later filed suit in the United States District Court for the Eastern District of North Carolina against Rockwell Semiconductor Systems,[1] alleging that Rockwell discriminated against him on the basis of his age in discharging him from employment. The district court granted Rockwell's motion for summary judgment and enforced the mandatory arbitration provision in Bradford's employment agreement, notwithstanding a fee-splitting provision that required Bradford to pay half of the arbitrator's fees and costs. Bradford argues on appeal that the fee-splitting provision renders the arbitration agreement unenforceable because the prohibitive costs of arbitration have prevented him from vindicating his statutory rights in the arbitral forum. Because Bradford has failed to show that the costs of arbitration were prohibitive or that he was deterred from pursuing his statutory rights, we affirm.

I.

Bradford was employed by the Brooktree Corporation, which was acquired by Rockwell. Rockwell offered him continued employment and sent him a "Mutual Agreement to Arbitrate Claims." (J.A. at 68-71.) The agreement provided that

> Except as otherwise provided in this Agreement, the Company and the Employee hereby consent to the resolution by arbitration of the following claims or controversies for which a court otherwise would be authorized by law to grant relief . . . . The Claims covered by this Agreement include, but are not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant, express or implied, tort claims; claims for discrimination, including but not limited to discrimination based on race, sex, religion, national origin, age, marital status, handicap, disability or medical condition, claims for benefits, . . . and

_____

[1] Rockwell is now known as Conextant Systems.

2

claims for violation of any federal, state or other governmental constitution, statute, ordinance or regulation.

(J.A. at 39.) The "Arbitration Procedures," which were attached to and referenced by the arbitration provision, provided that

To ensure that the Arbitrator is not biased in any way in favor of one party because that party is paying all or most of the Arbitration fees and costs, <u>the parties shall share equally the fees and costs of the Arbitrator</u>. Each party will deposit funds or post other appropriate security for its, his or her share of the Arbitrator's fee, in an amount and manner determined by the Arbitrator, 10 days before the first day of hearing. Each party shall pay for its own costs and attorney's fees, if any. However, if any party prevails on a statutory claim which entitles the prevailing party to attorney's fees, or if there is a written agreement providing for fees, the Arbitrator may award reasonable attorney's fees to the prevailing party in accordance with such statute or agreement.

(J.A. at 74 (emphasis added).) Bradford signed the agreement. On September 25, 1996, the day before the closing of the Brooktree acquisition, Rockwell informed Bradford that it would not employ him. Believing that his discharge was based upon age discrimination, Bradford filed a charge with the EEOC. On August 13, 1998, Bradford received a right to sue letter from the EEOC.

The procedural history of Bradford's claims follows two parallel routes because he pursued his claims both in arbitration and then in the district court. On February 12, 1998, Bradford filed a demand for arbitration with the American Arbitration Association ("AAA"), alleging that his termination violated the ADEA, breached his employment contract, and violated the public policy of North Carolina. On May 17 and 18, 1999, Bradford presented witnesses at the arbitration hearing, and on October 20, 1999, the arbitrator ruled against Bradford and dismissed his claims.

On September 23, 1998, while his arbitration was still pending, Bradford filed a complaint in the United States District Court for the

3

Eastern District of North Carolina alleging the same claims as were brought before the arbitrator. On July 30, 1999, the district court granted Rockwell's motion for summary judgment, concluding that Bradford had failed to meet his burden of demonstrating that the arbitration agreement was unenforceable against him because he had failed to offer any competent evidence that fee splitting would cause him financial hardship.[2] On August 27, 1999, Bradford filed a notice of appeal.

II.

Bradford argues that fee-splitting provisions necessarily render arbitration agreements unenforceable as a matter of law because, by requiring employees to pay part or all of the arbitration costs, such provisions deter employees who have been victims of discrimination from pursuing their rights, thus undermining the remedial and deterrent purposes of the federal antidiscrimination statutes.[3] Although Bradford concedes that he signed the arbitration agreement and that he initiated and received the full benefit of arbitration of his statutory claims, he asserts that we should adopt a per se rule that all arbitration agreements with fee-splitting provisions are unenforceable, irrespective of actual individual deterrence, based upon the overall deterrent effect of such provisions. Bradford also argues that even if he was required to show individual financial hardship and actual deterrence, the district court erred in concluding that he failed to do so. We review the district court's grant of summary judgment de novo. Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 877 (4th Cir. 1996).

Congress passed the Federal Arbitration Act (FAA), ch. 213, 43 Stat. 883 (1925) (codified as amended at 9 U.S.C.§ 1 et seq.), in order to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon

_____

[2] The district court assumed for the purpose of its analysis that a proper showing of financial hardship could render an arbitration agreement unenforceable.

[3] Bradford does not argue that the arbitration agreement is unenforceable in any other respect.

4

the same footing as other contracts." <u>Gilmer v. Interstate/Johnson Lane Corp.</u>, 500 U.S. 20, 24 (1991). The FAA manifests "a liberal federal policy favoring arbitration agreements," <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983), and thus, "[w]hen a valid agreement to arbitrate exists between the parties and covers the matter in dispute, the FAA commands the federal courts to stay any ongoing judicial proceedings and to compel arbitration," <u>Hooters of America, Inc. v. Phillips</u>, 173 F.3d 933, 937 (4th Cir. 1999) (internal citations omitted). The benefits of arbitration are well-documented. For example, we have previously noted that "[t]he arbitration of disputes enables parties to avoid the costs associated with pursuing a judicial resolution of their grievances. By one estimate, litigating a typical employment dispute costs at least $50,000 and takes two and one-half years to resolve." <u>Id.</u> at 936. Accordingly, "parties agree to arbitrate and trade `the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" <u>Id.</u> (quoting <u>Gilmer</u>, 500 U.S. at 31).

Federal statutory claims, such as claims under the ADEA, can be subjected to mandatory arbitration agreements. <u>See Gilmer</u>, 500 U.S. at 35. In <u>Gilmer</u>, the Supreme Court reasoned that agreements requiring arbitration of ADEA claims are enforceable because arbitration provides an adequate alternative forum to litigation in court through which claimants can resolve their statutory claims. <u>See id.</u> at 28. Thus, the Court concluded that "[s]o long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." <u>Id.</u> at 28 (alternations omitted).

Relying upon <u>Gilmer</u>'s rationale that statutory claims can be resolved in arbitration because arbitration is an adequate alternative forum to litigation, some courts have concluded that fee-splitting provisions render arbitration agreements unenforceable because the cost of fee splitting deters or prevents employees from vindicating their statutory rights in arbitral forums. <u>See Paladino v. Avnet Computer Technologies, Inc.</u>, 134 F.3d 1054, 1062 (11th Cir. 1998) (citing <u>Gilmer</u> and concluding that high costs of arbitration that may be imposed against an employee provide a legitimate basis for nullifying an arbitration agreement in part because "the arbitrability of [statutory claims] rests on the assumption that the arbitration clause permits

5

relief equivalent to court remedies. When an arbitration clause has provisions that defeat the remedial purpose, therefore, the arbitration clause is not enforceable." (internal citations omitted)); Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1483-85 (D.C. Cir. 1997) (relying upon Gilmer and stating that employers cannot require as a condition of employment that employees waive access to a neutral forum in which to resolve their statutory claims and that arbitration is not a reasonable substitute for a judicial forum if the employee must pay for the arbitrator because "they would never be required to pay for a judge in court").

Other courts, however, have refused to conclude that fee splitting, by itself, necessarily renders an arbitration provision unenforceable. See Williams v. Cigna Financial Advisors, Inc., 197 F.3d 752, 763-64 (5th Cir. 1999) (stating that "[i]n our opinion, . . . Gilmer does not so clearly imply that no part of arbitral forum fees may ever be assessed against federal anti-discrimination claimants, although it plainly indicates that an arbitral cost allocation scheme may not be used to prevent effective vindication of federal statutory claims," and upholding an arbitration agreement that required a Title VII claimant to pay half of the costs), cert. denied, 120 S. Ct. 1833 (May 1, 2000); Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 15-16 (1st Cir. 1999) (refusing to invalidate arbitration scheme simply because of the possibility that the arbitrator would charge the plaintiffs a forum fee "which may be as high as $3,000 per day and tens of thousands of dollars per case," because, among other reasons, "arbitration is often far more affordable to plaintiffs and defendants alike than is pursuing a claim in court"); Koveleskie v. SBC Capital Markets, Inc., 167 F.3d 361, 366 (7th Cir. 1999) (same), cert. denied, 528 U.S. 811 (Oct. 4, 1999); Arakawa v. Japan Network Group, 56 F. Supp.2d 349, 354-55 (S.D.N.Y. 1999) (same).**4**

_____

**4** We have not addressed this specific issue in a published opinion. Rockwell, however, points to our decision in EEOC v. Waffle House, 193 F.3d 805 (4th Cir. 1999), to argue that we have previously enforced arbitration agreements with fee-splitting provisions. Although it is true that the dissent in Waffle House discussed the fee-splitting provision in the arbitration agreement, see id. at 817 n.8 (King, J., dissenting) ("If an arbitration agreement requires the employee to pay a portion of the arbitrator's fees -- which often may amount to thousands of dollars -- an

6

Notably, although the courts and the parties differ on the extent to which fee splitting automatically renders an arbitration agreement unenforceable even absent any showing of individual hardship or deterrence, it is undisputed that fee splitting can render an arbitration agreement unenforceable where the arbitration fees and costs are so prohibitive as to effectively deny the employee access to the arbitral forum. See Green Tree Financial Corp.-Alabama v. Randolph, 121 S. Ct. 513, 522 (2000) ("It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum."). The question, therefore, is whether we should apply a case-by-case basis inquiry in making this determination, or whether we should apply a broad per se rule against all fee-splitting irrespective of the circumstances surrounding each individual's case.

Bradford relies primarily upon the D.C. Circuit's decision in Cole to argue that a per se rule should apply. In Cole, the D.C. Circuit applied a per se rule against fee splitting regardless of individual financial hardship and deterrence, reasoning that "an employee can never be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims under Title VII (any more than an employee can be made to pay a judge's salary). If there is any risk that an arbitration agreement can be construed to require this result, this would surely deter the bringing of arbitration and constitute a de facto forfeiture of the employee's statutory rights." Cole, 105 F.3d at 1468 (footnote omitted). Thus, the Cole court concluded that"[t]he only way that an arbitration agreement of the sort at issue here can be lawful is if the employer assumes responsibility for the payment of the arbitrator's compensation." Id. Cole premised its objection to fee splitting on the assumption that employees, by agreeing to fee splitting, essentially agree "as a condition of employment to waive access to a neutral

_____

accessible forum is, in effect, unavailable, because of the disincentive to arbitrate created by such fees. Under these circumstances, an employee like Mr. Baker is unlikely to pursue his statutory claims." (internal citation omitted)), there is no indication in the majority opinion that the fee-splitting provision was briefed by the parties or addressed by the panel majority. Thus, Waffle House does not guide us in deciding this question.

7

forum in which statutory employment discrimination claims may be heard." Id. at 1482. The Cole court's position can be summarized as follows:

> Under Gilmer, arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress's intent to prevent employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court.
>
> There is no doubt that parties appearing in federal court may be required to assume the cost of filing fees and other administrative expenses, so any reasonable costs of this sort that accompany arbitration are not problematic. However, if an employee like Cole is required to pay arbitrators' fees ranging from $500 to $1,000 per day or more, in addition to administrative and attorney's fees, is it likely that he will be able to pursue his statutory claims? We think not. ... These fees would be prohibitively expensive for an employee like Cole, especially after being fired from his job, and it is unacceptable to require Cole to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court. Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment. Absent this requirement, the employee would be free to pursue his claims in court without having to pay for the services of a judge. In such a circumstance--where arbitration has been imposed by the employer and occurs only at the option of the employer--arbitrators' fees should be borne solely by the employer.

Id. at 1484-85 (internal citations and footnotes omitted).

Bradford also points to the Tenth Circuit's decision in Shankle v. B-G Maintenance Mgmt. of Colorado, Inc., 163 F.3d 1230 (10th Cir. 1999), which relied upon Cole to hold an arbitration agreement unen-

8

forceable because of a mandatory fee-splitting provision. The <u>Shankle</u> court stated that

> [t]he Agreement . . . placed Mr. Shankle between the proverbial rock and a hard place -- it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limited use of the arbitral forum. Essentially, B-G Maintenance required Mr. Shankle to agree to mandatory arbitration as a term of continued employment, yet failed to provide an accessible forum in which he could resolve his statutory rights. Such a result clearly undermines the remedial and deterrent functions of the federal anti-discrimination laws.

<u>Id.</u> at 1235 (internal citations omitted). Notably, although <u>Shankle</u> found that the fee-splitting provision rendered the arbitration agreement unenforceable, it framed its analysis in terms of the complaining party's actual inability to afford the arbitration costs and fees. <u>See id.</u> at 1234 ("Assuming Mr. Shankle's arbitration would have lasted an average length of time, he would have had to pay an arbitrator between $1,875 and $5,000 to resolve his claims. Mr. Shankle could not afford such a fee, and it is unlikely other similarly situated employees could either.").

The courts that have explicitly rejected <u>Cole</u>'s per se rule in favor of a case-by-case approach have reasoned that although <u>Gilmer</u> "plainly indicates that an arbitral cost allocation scheme may not be used to prevent effective vindication of federal statutory claims," it does not require the conclusion that "no part of arbitral forum fees may ever be assessed against federal anti-discrimination claimants." <u>Williams</u>, 197 F.3d at 763. Accordingly, these courts view the pertinent question under <u>Gilmer</u> as whether fee splitting prevents the claimant from effectively vindicating his statutory rights, not whether fee splitting can, in the abstract, deter some claimants from vindicating their rights regardless of the individual circumstances of each case. These courts read <u>Gilmer</u> as making clear that

> a party agreeing to arbitrate a federal statutory claim does not forgo the substantive rights afforded by the statute, and that claims under federal statutes are appropriate for arbitra-

9

> tion so long as <u>the prospective litigant</u> effectively may vindicate his or her statutory cause of action in the arbitral forum, and the statute will continue to serve both its remedial and deterrent function. <u>Gilmer</u>, and the cases upon which it relies, make clear that whether a federal statutory claim can be subjected to compulsory arbitration depends upon whether <u>the particular arbitral forum involved</u> provides an adequate substitute for a judicial forum in protecting the particular statutory right at issue.

<u>Williams</u>, 197 F.3d at 763 (emphasis added and internal citations omitted). In other words, these courts focus upon whether the particular claimant has a full and fair opportunity to vindicate his statutory claims. <u>See id.</u> at 764. This inquiry necessarily turns in part upon whether the claimant is able to pay his share of the forum fees at issue or whether the forum fees in a particular case are so prohibitively expensive as to deter arbitration. <u>See id.</u> ("In the present case, Williams has not demonstrated that the arbitrators' order that he pay one-half of the forum fees prevented him from having a full opportunity to vindicate his claims effectively or prevented the arbitration proceedings from affording him an adequate substitute for a federal judicial forum. The evidence in this case does not indicate that Williams is unable to pay one-half of the forum fees or that they are prohibitively expensive for him."); <u>Rosenberg</u>, 170 F.3d at 15-16 (rejecting argument that arbitration agreement could not be enforced because of fee splitting).

We agree with <u>Williams</u> that the crucial inquiry under <u>Gilmer</u> is whether the particular claimant has an adequate and accessible substitute forum in which to resolve his statutory rights and that <u>Gilmer</u> does not call for the conclusion that fee splitting, in all cases, deprives the claimant of such a forum. We believe that the appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims. <u>See Williams</u>, 197 F.3d at 764 (focusing upon the inability to pay; whether the forum fees created a prohibitive expense; whether Williams had

10

a full opportunity to vindicate his claims; and whether the forum fees prevented the arbitral forum from providing an adequate substitute for the judicial forum); Rosenberg, 170 F.3d at 16 (focusing in part upon the cost differential between arbitration and litigation); Shankle, 163 F.3d at 1235 & n.4 (focusing in part on the fact that Shankle and similarly situated employees could not afford the fee and rejecting argument that fee-shifting provision mitigated the burden because "the Agreement does not actually shift responsibility for payment of fees based on ability to pay"). Although the Cole court framed its concern with fee-splitting partially in terms of the fact that arbitrators' fees are "unlike anything that [a claimant] would have to pay to pursue his statutory claims in court" because a claimant normally "would be free to pursue his claims in court without having to pay for the services of a judge," Cole, 105 F.3d at 1484-85, we believe that the proper inquiry under Gilmer is not where the money goes but rather the amount of money that ultimately will be paid by the claimant. Indeed, we fail to see how a claimant could be deterred from pursuing his statutory rights in arbitration simply by the fact that his fees would be paid to the arbitrator where the overall cost of arbitration is otherwise equal to or less than the cost of litigation in court.[5]

_____

[5] The cost of arbitration, as far as its deterrent effect, cannot be measured in a vacuum or premised upon a claimant's abstract contention that arbitration costs are "too high." Rather, an appropriate case-by-case inquiry must focus upon a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs. Another factor to consider in the cost-differential analysis is whether the arbitration agreement provides for fee-shifting, including the ability to shift forum fees based upon the inability to pay. We note that parties to litigation in court often face costs that are not typically found in arbitration, such as the cost of longer proceedings and more complicated appeals on the merits. See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 16 (1st Cir. 1999) (concluding that the mere possibility that the claimant would have to pay up to tens of thousands of dollars in forum fees did not warrant nullifying arbitration agreement in part because "arbitration is often far more affordable to plaintiffs and defendants alike than is pursuing a claim in court"); cf. Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991) ("Although these procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.").

11

Our conclusion that the proper inquiry is a case-by-case analysis rather than a per se rule is bolstered by the Supreme Court's recent decision in Green Tree Financial Corp.-Alabama v. Randolph, 121 S. Ct. 513 (2000). In Green Tree, the Court addressed "whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs." Id. at 517. In resolving this question, the Court recognized that "[i]t may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum." Id. at 522. The Court noted, however, that "the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter." Id. Accordingly, the Court stated that

> [t]he record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement. To invalidate the agreement on that basis would undermine the liberal federal policy favoring arbitration agreements. It would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.

Id. (internal quotation marks and citations omitted and emphasis added). The Court further stated that "[w]e have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue. Similarly, we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden." Id. (internal citations omitted). In other words, the Green Tree Court rejected Randolph's argument because Randolph could not satisfy her burden of establishing that she was likely to incur prohibitive costs that would deter her from arbitrating her claims. We believe that the Green Tree Court's focus on each individual claimant's "burden of proving that the claims at issue are unsuitable for arbitration," its

12

emphasis on Randolph's inability to show that she was in fact likely to incur prohibitive costs, and its refusal to nullify the arbitration agreement based upon an abstract and speculative risk that the claimant might, under some circumstances, incur prohibitive costs, is significant. Id. The Green Tree Court's refusal to accept the speculative risk that a claimant might incur prohibitive costs undermines the rationale of those courts that would impose a per se prohibition against an arbitration provision that might impose prohibitive costs against an individual on the theory that any such risk of prohibitive costs, even if that risk is entirely uncertain, surely deters the bringing of arbitration.

Although Green Tree involved a slightly different fact situation than the present case because it involved an arbitration agreement that remained silent on the issue of costs as opposed to explicitly requiring fee-splitting, we believe that it is nevertheless instructive because it clearly analyzed the issue before it -- whether the possibility of fee-splitting precludes a litigant from effectively vindicating her federal statutory rights in the arbitral forum -- in terms of the individual litigant and the arbitration agreement before it, rather than in terms of a broad per se rule that would nullify or invalidate an entire category of arbitration provisions. Notably, the Green Tree Court suggested that some showing of individualized prohibitive expense would be necessary to invalidate an arbitration agreement on the ground that fee splitting would be prohibitively expensive, although it did not decide that issue. See id. at 522-23 ("How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss . . . ."). We believe that the Green Tree Court's focus on Randolph's individualized costs and, by inference, the individualized deterrent effect arising from those costs, cautions against adopting the broad per se rule sought by Bradford.

III.

Having concluded that a case-by-case inquiry, rather than a per se rule, is more appropriate for determining the enforceability of an arbitration agreement that contains a fee-splitting provision, we now address whether the district court erred in granting Rockwell's motion for summary judgment based on a finding that Bradford failed to

13

show any evidence of financial hardship. Reviewing the district court's grant of summary judgment de novo, <u>Austin v. Owens-Brockway Glass Container, Inc.</u>, 78 F.3d 875, 877 (4th Cir. 1996), we agree that Bradford has failed to demonstrate any inability to pay the arbitration fees and costs, much less prohibitive financial hardship, to support his assertion that the fee-splitting provision deterred him from arbitrating his statutory claims.

In the present case, Bradford has offered no evidence that he was unable to pay the $4,470.88 that he was billed by the AAA, or that the fee-splitting provision deterred him from pursuing his statutory claim or would have deterred others similarly situated.[6] <u>See Williams</u>, 197 F.3d at 764. To the contrary, the evidence shows that rather than being deterred, Bradford himself initiated arbitration, and he concedes that he received a full and fair arbitration hearing that adjudicated his case on the merits, although he ultimately did not prevail before the arbitrator. We, of course, recognize that there are some circumstances under which "the existence of large arbitration costs could preclude a litigant such as [Bradford] from effectively vindicating [his] federal statutory rights in the arbitral forum." <u>Green Tree</u>, 121 S. Ct. at 522. But, this is not such a case. Indeed, this case presents a paradigmatic

_____

[6] Bradford argued before the district court that he filed for arbitration "despite the financial hardship and his preference for a judicial forum," (J.A. at 61), and that "[t]he deterrent effect of these costs is evident in the fact that [he] waited until February 12, 1998 to file his demand for arbitration." (J.A. at 64.) Bradford also argued that arbitration costs would be $800 per day, along with a $2,000 deposit with the AAA as security for his portion of the costs. Bradford, however, has failed to offer any evidence of the expected cost of litigation or that he suffered any hardship as a result of the arbitration agreement, except for the conclusory assertions that he preferred federal court over arbitration and that "arbitration would be significantly more expensive than the costs in federal court." (J.A. at 60.) We note that Bradford was earning $115,000 in base salary at the time of his discharge and, in addition, he had "consistently earned sales incentives averaging $53,000 per year for the past three years" prior to his discharge. (J.A. at 44.) We also note that the fee-splitting provision permits the prevailing party to recover attorney's fees where provided by statute or written agreement, although it is unclear whether the agreement permits the arbitrator to award arbitrator's costs and forum fees to the prevailing party.

14

example of why fee-splitting should not be deemed to automatically render an arbitration agreement unenforceable because Bradford was in no way deterred from attempting to vindicate his rights by means of a full and fair arbitration proceeding. Invalidating the arbitration provision now, after the arbitrator has already ruled upon his claim, would simply give Bradford a second bite of the apple under circumstances in which there is no evidence that allowing him to pursue his litigation in court would cost him any less than the amount of money that he has already spent in arbitration.**7** Accordingly, we affirm the district court's grant of summary judgment in favor of Rockwell.

_____

**7** It therefore makes sense that the individual who claims to be financially burdened by the fee-splitting provision should raise his objections to the fee-splitting arrangement, including a specific forecast of his expected costs and his expected financial burden, prior to the beginning of arbitration. Here, however, Bradford demanded arbitration first, and then, almost six months later, filed his complaint in district court. Although the complaint mentioned the existence of the agreement to arbitrate, it did not seek to invalidate the agreement or question the validity of the fee-splitting provision. In fact, Bradford raised the issue for the first time in his response to Rockwell's motion to dismiss the complaint -- a response that was filed <u>after</u> Bradford presented witnesses in support of his claim at the arbitration hearing, but before a decision had been rendered. Under these circumstances, it is clear that the fee-splitting provision in fact did not deter Bradford from pursuing his rights. Therefore, even if we accepted Bradford's unsupported assertion that the cost of fee splitting in this case was unduly burdensome, we believe that he would not be entitled to another chance to litigate the same claims, but instead would be entitled to, at most, a refund of the excess fees that he paid. <u>Cf. Green Tree Financial Corp.-Alabama v. Randolph</u>, 121 S. Ct. 513, 525 (2000) (Ginsburg, J., dissenting) ("The Court's opinion, if I comprehend it correctly, does not prevent Randolph from returning to court, post arbitration, if she then has a complaint about cost allocation. If that is so, the issue reduces to when, not whether, <u>she can be spared from payment of excessive costs</u>." (emphasis added)). Indeed, we note that the arbitration agreement explicitly provides that "[i]f any provision of this Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, such adjudication shall not affect the validity of the remainder of the Agreement." (J.A. at 69.)

15

IV.

In conclusion, we agree with those courts that have applied a case-by-case inquiry as to whether mandatory fee-splitting renders an arbitration agreement unenforceable. We believe that such an approach is particularly appropriate in a situation where, as here, the complaining party not only initiated arbitration, but he also received the full benefit of arbitration proceedings and cannot demonstrate any resulting financial hardship. For these reasons, we affirm the district court's grant of summary judgment in favor of Rockwell.

AFFIRMED

16