Filed: June 4, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-1602
(CA-98-2221-JFM)


Daniel C. Murray,

Plaintiff - Appellant,

versus

United Food and Commercial Workers
International Union, etc., et al.,

Defendants - Appellees.


O R D E R


The court amends its opinion filed May 10, 2002, as follows:

On page 11, second full paragraph, line 9 -- the phrase "to injury Murray" is corrected to read "to injure Murray."

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

DANIEL C. MURRAY,
*Plaintiff-Appellant,*

v.

UNITED FOOD AND COMMERCIAL    No. 01-1602

WORKERS INTERNATIONAL UNION,
Local 400; DONALD CASH; CHRISTIAN
SAUTER,
*Defendants-Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.

(CA-98-2221-JFM)

Argued: October 31, 2001

Decided: May 10, 2002

Before WILLIAMS and TRAXLER, Circuit Judges, and

Malcolm J. HOWARD, United States District Judge for

the Eastern District of North Carolina,

sitting by designation.

_____

Reversed and remanded by published opinion. Judge Traxler wrote
the majority opinion, in which Judge Williams joined. Judge Howard
wrote a dissenting and concurring opinion.

_____

## COUNSEL

**ARGUED:** Paul Francis Evelius, WRIGHT, CONSTABLE &
SKEEN, L.L.P., Baltimore, Maryland, for Appellant. Francine Karen

Weiss, KALIJARVI, CHUZI & NEWMAN, P.C., Washington, D.C., for Appellees.

_____

## OPINION

TRAXLER, Circuit Judge:

Daniel C. Murray ("Murray") brought this action against his employer, the United Food & Commercial Workers Union, Local 400 ("Local 400"), and Donald Cash ("Cash"), a union managerial employee, alleging that they discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C.A. §§ 2000e - 2000e-17 (West 1994 & Supp. 2001), and 42 U.S.C.A. § 1981 (West 1994), when they terminated him from his employment. Murray also alleged a pendent state law claim for defamation against Local 400 and its organizing director, Christian Sauter ("Sauter"), arising from alleged defamatory statements made by Sauter after Murray was fired. The district court granted defendants' motion to dismiss and to compel arbitration of Murray's discrimination claim, and granted defendants' motion to dismiss Murray's defamation claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted. We reverse and remand.

### I.

Local 400 of the United Food & Commercial Workers Union is a labor union representing approximately 40,000 members, many of whom are employed in retail food stores. In February 1997, Murray took a leave of absence from his position as a produce clerk at Giant Food, Inc., and began working full-time as a union organizer for Local 400. As a condition of his employment with Local 400, Murray was required to sign an agreement containing the following arbitration clause:

> All Representatives are employed under the terms of the Bylaws of Local 400. Any claims of . . . discrimination which . . . ha[ve] not been properly remedied through [Local

2

400's internal discrimination complaint process], shall be determined and adjudicated through final and binding arbitration. *A single arbitrator shall be chosen by the alternate strike method from a list of arbitrators provided by the [Local 400] President's office. Such arbitrator shall not have the authority to alter[,] change or diminish any power, right or authority granted to the President* or Acting President of Local 400 under the terms and conditions of the Bylaws of Local 400.

J.A. 79 (emphasis added).

On June 29, 1998, Local 400 and Donald Cash informed Murray that his employment with Local 400 would be terminated effective July 11, 1998. Murray returned to his position at Giant Food and, on July 10, 1998, instituted this action against Local 400 and Cash under Title VII and § 1981. Murray, a 42-year-old white male, alleged that Local 400 and Cash, who is African American, terminated "his employment on account of his race even though he is qualified for that employment, and . . . defendants plan to retain similarly situated African American employees because of their race." J.A. 8. Among other relief, Murray sought reinstatement to his position as a union organizer and monetary damages.

In September 1998, Murray amended his complaint to add Christian Sauter, Local 400's Organizing Director, as a defendant and asserted a state law defamation claim against Local 400 and Sauter. Murray alleged that Sauter defamed him after he was terminated from his position as a union organizer with Local 400 by telling one or more Giant Food employees that Murray "was not a good organizer." J.A. 230.

Defendants filed a motion to dismiss and to compel arbitration of Murray's discrimination claim, as well as a motion to dismiss Murray's defamation claim for failure to state a claim for relief under Maryland law. The district court granted both motions, holding that (1) the discrimination claim was subject to the arbitration agreement between Local 400 and Murray, and (2) Sauter's statements failed to state an actionable defamation claim under Maryland law. The district

3

court subsequently denied Murray's motion to reconsider, and the parties proceeded to arbitration of Murray's discrimination claim.

At the conclusion of arbitration, the single arbitrator ruled in favor of Local 400 and Cash, concluding that Murray had failed to establish a prima facie case of unlawful discrimination and, in any event, that Local 400 had articulated legitimate nondiscriminatory reasons for Murray's discharge. The district court then confirmed the award and entered final judgment. Murray now appeals the district court's grant of defendants' motion to dismiss and to compel arbitration of his discrimination claim, as well as the district court's dismissal of his defamation claim under Rule 12(b)(6).

## II.

We begin with Murray's contention that the district court erred in granting the motion to dismiss and to compel arbitration of his race discrimination claim brought under Title VII and § 1981 against Local 400 and Cash.

## A.

The Federal Arbitration Act ("FAA"), 9 U.S.C.A. §§ 1-16 (West 1999) represents "a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), in order "`to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts,'" *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 89 (2000) (alteration in original) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). "Pursuant to th[is] liberal policy,`any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 273-74 (4th Cir. 1997) (quoting *Moses H. Cone*, 460 U.S. at 24-25). When parties have entered into a valid and enforceable agreement to arbitrate their disputes and the dispute at issue falls within the scope of that agreement, the FAA requires federal courts to stay judicial pro-

4

ceedings, *see* 9 U.S.C.A. § 3, and compel arbitration in accordance with the agreement's terms, *see* 9 U.S.C.A. § 4.

It is settled that the provisions of the FAA, and its policy favoring the resolution of disputes through arbitration, apply to employment agreements to arbitrate discrimination claims brought pursuant to federal statutes, including Title VII of the Civil Rights Act. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 937 (4th Cir. 1999). Such an agreement is enforceable because "`[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than judicial, forum.'" *Hooters*, 173 F.3d at 937 (quoting *Gilmer*, 500 U.S. at 26). If "the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum," the claim is appropriately subjected to arbitration in lieu of litigation. *Green Tree*, 531 U.S. at 89 (internal quotation marks and alteration omitted).

The strength of this well-established policy favoring the enforcement of valid arbitration agreements, however, does not end our inquiry. Rather, courts are called upon to determine whether the particular dispute at issue is one to be resolved through arbitration. In doing so, "we engage in a limited review to ensure that the dispute is arbitrable — i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Hooters*, 173 F.3d at 938 (internal quotation marks omitted). Although "highly circumscribed," the "judicial inquiry . . . is not focused solely on an examination for contractual formation defects such as lack of mutual assent and want of consideration." *Id.* Rather, the FAA specifically contemplates that parties may also seek revocation of an arbitration agreement "under `such grounds as exist at law or in equity,' including fraud, duress, and unconscionability." *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001) (quoting 9 U.S.C.A. § 2). And, of course, agreements to arbitrate federal statutory claims, such as those pursued under Title VII, may be revoked if the prospective litigant demonstrates that it cannot "effectively . . . vindicate his or her statutory cause of action in the arbitral forum." *Green Tree*, 531 U.S. at 89 (internal quotation marks and alteration omitted); *cf. Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 556 (4th Cir. 2001) ("[T]he crucial

5

inquiry . . . is whether the particular claimant has an adequate and accessible substitute forum in which to resolve his statutory rights. . . .").

B.

With these principles in mind, we turn to the question of whether a valid and enforceable arbitration agreement existed between Murray and Local 400 which compelled Murray to submit his race discrimination claim to arbitration. Murray asserts that the arbitration clause, drafted by Local 400 and to which he was required to accede as a condition of his employment, is not valid and enforceable because it is structurally biased in favor of Local 400. More specifically, Murray points to the agreement's requirement (1) that "[a] single arbitrator shall be chosen by the alternate strike method from a list of arbitrators provided by the President's office"; and (2) that, in any event, "[s]uch arbitrator shall not have the authority to alter [,] change or diminish any power, right or authority granted to the President . . . of Local 400 under the terms and conditions of the Bylaws of Local 400." J.A. 79. Construed together, Murray claims, these clauses render the agreement grossly unfair and one-sided by placing choice of the arbitrator exclusively in the hands of Local 400 and providing that, in any event, Local 400 can disregard the arbitration result because the arbitrator cannot alter the President's authority, under the Local 400 Bylaws, to "terminate the employment of any [personnel] at the end of an assignment or in the best interest of the Local Union." J.A. 126.

In accordance with the principles outlined above, we have previously recognized that equity may require invalidation of an arbitration agreement that is unconscionable, *see Sydnor*, 252 F.3d at 305; *Hooters*, 173 F.3d at 938, as well as an arbitration agreement that allows an employer to ignore the arbitration result, *see Johnson v. Circuit City Stores*, 148 F.3d 373, 378 (4th Cir. 1998); *O'Neil*, 115 F.3d at 274-75. Indeed, in *Hooters*, we revoked an arbitration agreement plagued by rules and procedures which were "so one-sided that their only possible purpose [was] to undermine the neutrality of the proceeding." *Hooters*, 173 F.3d at 938. Among other unfair procedures, the agreement in *Hooters* provided that Hooters and the employee would each select an arbitrator, who would in turn select the third arbitrator. But, the employee's arbitrator and the third arbitrator were

6

required to be selected from a list of arbitrators created exclusively by Hooters. No limits were placed on whom Hooters could put on the list, giving Hooters absolute control over the selection of the entire panel. *See id.* at 938-39. Such a mechanism for selecting an arbitration panel to adjudicate the employee's statutory claim, we held, was one "crafted to ensure a biased decisionmaker." *Id.* at 938.

In this case, we are presented with a quite similar method for choosing the decisionmaker. As a condition of his employment, Murray was required to enter into an arbitration agreement drafted by his prospective employer that placed control over the selection of the single arbitrator for employment disputes in the hands of his employer. The parties ostensibly engage in an alternate strike method to select the single arbitrator from a list of prospective arbitrators, but they exercise these alternate strikes "from a list of arbitrators provided by" Local 400 with absolutely no specified constraints. J.A. 79. In this respect, the selection method is virtually indistinguishable from the one we disapproved of in *Hooters*:

> [The employer] is free to devise lists of partial arbitrators who have existing relationships, financial or familial, with [the employer] and its management. In fact, the rules do not even prohibit [the employer] from placing its managers themselves on the list. Further, nothing in the rules restricts [the employer] from punishing arbitrators who rule against the company by removing them from the list. Given the unrestricted control that [the employer] has over the panel, the selection of an impartial decision maker would be a surprising result.

*Id.* at 939. And, as in *Hooters*, the one-sided nature of the arbitration agreement is not limited to the employer providing itself with the exclusive right to select the list of potential arbitrators from which the ultimate decisionmaker will be selected. In the unlikely event the hand-picked arbitrator rules against Local 400, the language of the arbitration agreement in conjunction with the Union's Bylaws, even if not ultimately enforceable, might be construed by the employee as prohibiting a decision that would contravene the President's right to terminate the employee in any event.

7

Although an arbitration agreement will not be invalidated for failure to "replicate the judicial forum," *id.* at 940, we again refuse to enforce an agreement so "utterly lacking in the rudiments of even-handedness," *id.* at 935. By agreeing to arbitration in lieu of litigation, the parties agree to "trade `the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'" *Id.* at 936 (quoting *Gilmer*, 500 U.S. at 31). They do not agree to forego their right to have their dispute fairly resolved by an impartial third party. *See id.* at 941 (noting that, although objections to the fairness of an arbitral proceeding in general must be submitted to the arbitrator in the first instance, the arbitration proceeding may be so skewed in one party's favor as to deny the other party "arbitration in any meaningful sense of the word"). In such a case, the agreement is unconscionable and one under which the prospective litigant cannot effectively vindicate the statutory cause of action. *See Green Tree*, 531 U.S. at 89.

### C.

For its part, Local 400 asserts that we should look beyond the language of the arbitration clause, accept that arbitration under the agreement was conducted before a fair and unbiased arbitrator, and trust that had the decision gone the other way, Local 400 would not have asserted a right to terminate Murray under the agreement's deference to its Bylaws. We decline to do so.

Before the district court, Local 400 asserted that it did not maintain a list of arbitrators and that the President's office would instead have to obtain a list of neutral arbitrators from the American Arbitration Association's Labor Arbitration Rules or the Federal Mediation and Conciliation Service as it does in its collective bargaining agreements with employers. When Murray pointed out that this procedure for selecting an arbitrator in the collective bargaining context would not apply in individual employment cases, Local 400 then argued that it would instead request a list of arbitrators under the American Arbitration Association's National Rules for the Resolution of Employment Disputes, which could apply to individual employment cases. After the district court granted Local 400's motion to compel arbitration, such a list was obtained and a single arbitrator was selected from it using the alternate strike method.

8

Based upon this construction of the arbitration agreement's selection provision, Local 400 asserts that the agreement is valid and enforceable because it "must be construed as requiring the President [of Local 400] to provide a neutral list of arbitrators from which the parties can choose an arbitrator." Brief of Appellees at 17. Additionally, Local 400 argues that we should not construe the agreement's provision denying the selected arbitrator any authority to "alter[,] change or diminish any power, right or authority granted to the President . . . of Local 400 under the terms and conditions of the Bylaws of Local 400," J.A. 79, as allowing it to disregard the arbitrator's decision because, the argument goes, a discriminatory termination could not be construed as an action taken "in the best interest of" Local 400, J.A. 126.

The flaw in Local 400's argument, of course, is that there is no reference to the AAA National Rules for the Resolution of Employment disputes, or to any other rules governing the selection of an arbitrator, anywhere in the language of the arbitration agreement, no doubt engendering the uncertainty and confusion in this case. Furthermore, the agreement is not merely silent as to the selection method; the selection method is to be by the alternate strike method from a list of arbitrators arbitrarily selected or created by Local 400, and then provided to the employee. Local 400's argument, therefore, is little more than a claim that because Local 400 says it will provide a list of neutral arbitrators and abide by the ultimate arbitration decision, the selection procedure is not one-sided and the agreement is not unconscionable. We decline to allow Local 400 to salvage the agreement simply because it may have provided, after much haranguing, a list of impartial arbitrators in this case, or because it promises to act fairly in future cases. The arbitration agreement is unenforceable as written and Local 400 may not rewrite the arbitration clause and adhere to unwritten standards on a case-by-case basis in order to claim that it is an acceptable one. *Cf. Perez v. Globe Airport Sec. Servs. Inc.*, 253 F.3d 1280, 1285-86 (11th Cir. 2001) (rejecting attempt to rewrite unenforceable arbitration clause in order to salvage it).

Nor is it appropriate for us to now adjudicate Local 400's claim that the arbitration in this case was ultimately conducted in a fair manner before an impartial arbitrator, a fact that at least appears to remain the subject of some dispute. When the order compelling arbi-

9

tration was entered, the parties reasonably believed that it was not immediately appealable under this circuit's existing precedent. *See, e.g., American Cas. Co. v. L-J, Inc.*, 35 F.3d 133, 135 (4th Cir. 1994). Consequently, this appeal is the first opportunity Murray has had to challenge the order of arbitration. We now know that such an order compelling arbitration and dismissing the underlying claims is "a final decision with respect to an arbitration," 9 U.S.C.A. § 16(a)(3), which is immediately appealable. *See Green Tree*, 531 U.S. at 89. The Supreme Court's decision in *Green Tree*, however, post-dates the district court's order compelling arbitration. Had it been otherwise, Murray would have been entitled to immediately appeal the order compelling arbitration under the agreement and challenge the validity of the agreement here before being forced to litigate his claims in the arbitral forum at all. Because of the uncertainty in the law, the fact that Murray has not been able to appeal the issue until now cannot be held against him. In the future, this procedural uncertainty will not exist.

To conclude, we hold that the arbitration agreement is unenforceable and, therefore, that the district court erred in compelling arbitration. Although we note that the district court did not have the benefit of our decision in *Hooters* or of the Supreme Court in *Green Tree* when it granted Local 400's motion to compel arbitration of Murray's discrimination claims, we are nonetheless constrained to reverse the order compelling arbitration and remand the claims for litigation in the judicial forum.

III.

We now turn to Murray's claim that the district court erred in ruling that Murray failed to state an actionable defamation claim against Sauter and Local 400 under Maryland law and, therefore, in dismissing the claim pursuant to Rule 12(b)(6). In dismissing the claim, the district court ruled that Sauter's statement that Murray "was not a good organizer" was not defamatory *per se* under Maryland law, and that the statement was merely the expression of Sauter's opinion, as opposed to one of fact, which could be neither verified nor refuted in litigation.

"Under Maryland law, a defamatory statement is one that tends to expose a person to public scorn, hatred, contempt or ridicule, thereby

10

discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Samuels v. Tschechtelin*, 763 A.2d 209, 241-42 (Md. Ct. Spec. App. 2000) (internal quotation marks omitted). "To establish a *prima facie* case of defamation when the plaintiff is not a public figure, the plaintiff must prove: (1) that the defendant made a defamatory communication to a third person; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm." *Id.* at 242.

While the tort of defamation is generally viewed as one based upon false assertions of fact, it may also be based upon the expression of an opinion to a third person if the "opinion contains implied assertions of underlying objective fact." *Id.* at 242. Although "loose, figurative, or hyperbolic language" expressing a mere opinion may not fairly be viewed as being defamatory, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990), "a false statement of fact cannot escape liability for defamation under the guise of opinion." *Samuels*, 763 A.2d at 242 (citing *Milkovich*, 497 U.S. at 18). "[A] statement, even if expressed in terms of an opinion, can be defamatory under certain circumstances. . . . When the underlying facts used to form the opinion are not given along with the defamatory statement, the statement itself may be treated as being factual and therefore potentially defamatory." *Peroutka v. Streng*, 695 A.2d 1287, 1297 (Md. Ct. Spec. App. 1997).

Subsequent to the district court's dismissal of Murray's defamation claim in this case, the Maryland Court of Special Appeals held that an employer's statement that an employee "had been terminated for poor performance" was defamatory *per se* under its law. *Samuels*, 763 A.2d at 241; *see id.* at 245. Murray's claim of defamation has its genesis in the allegation that "Sauter stated, at least twice, to one or more Giant employees, that [Murray] was not a good organizer," and that he did so with knowledge of the falsity of this statement and with the intent to injure Murray. J.A. 230. Sauter, it is alleged, was the Organizing Director for Local 400 and made these statements shortly after Murray was terminated from his employment as a full-time organizer for Local 400. While perhaps an expression of Sauter's opinion of Murray, it is at least arguably an opinion that might be construed as implying Murray's failure to fulfill the duties of his position of a union organizer. Because the alleged defamatory statement contains

11

such "implied assertions of underlying objective fact," *Samuels*, 763 A.2d at 242, and in view of this recent Maryland precedent, we hold that Murray's allegation was sufficient to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim for defamation under Maryland law and, accordingly, reverse and remand this claim for further proceedings as well.

### IV.

For the foregoing reasons, we reverse the district court's decision granting defendants' motion to dismiss Murray's Title VII claim and compelling arbitration, reverse the district court's decision granting defendants' motion to dismiss Murray's state law defamation claim, and remand this matter for further proceedings.

*REVERSED AND REMANDED*

HOWARD, District Judge, dissenting in part and concurring in part:

I concur with the majority's decision in Part III. However, because I think an arbitration agreement is not rendered unconscionable merely by its failure to state how a party will obtain a list of arbitrators, I respectfully dissent from Part II of the majority's opinion.

The issue presented in Part II is whether equitable grounds exist for the revocation of an otherwise valid agreement to arbitrate. The majority concludes that an arbitration agreement's silence with respect to an employer's procedures for obtaining a list of arbitrators renders the arbitration agreement unconscionable. The majority also indicates that an arbitration agreement contains unconscionable terms when an employee might construe the arbitration agreement and bylaws as allowing the President of the Union to fire an employee irrespective of the arbitrator's decision.

I consider the majority's refusal to enforce the arbitration clause on unconscionability grounds inconsistent with both Supreme Court and Fourth Circuit precedent. *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000); *Hooters of Am. v. Phillips*, 173 F.3d 933 (4th Cir. 1999). First, I do not believe that an arbitration agreement's

12

failure to specify how a party obtains a list of arbitrators is a contract provision egregious enough to "shock the conscience." Second, Murray has failed to show an anticipatory breach by the Union in providing a list of neutral arbitrators to hear the parties' dispute. Finally, I decline to read the arbitration agreement and bylaws as foreclosing a decision unfavorable to the Union. Accordingly, I would affirm the district court's decision to dismiss Murray's discrimination claim and compel arbitration.

### I.

Congress enacted the FAA to combat a "longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). In evaluating whether an enforceable agreement to arbitrate exists, courts apply ordinary contract principles. *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001). Moreover, federal courts should not single out arbitration agreements for suspect status, but should evaluate arbitration agreements under prevailing contract standards. *Id.* (quoting *Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 687 (1996)).

In determining whether a valid agreement to arbitrate exists, the court must first ask whether the parties agreed to submit their claims to arbitration. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000). In the instant case, the parties agree that Murray signed a binding arbitration agreement that covered his discrimination claims. Murray also cannot contend that Congress intended to preclude the waiver of his judicial remedies for discrimination claims. *Id.*; *Austin v. Owens-Brockway Glass Container*, 78 F.3d 875, 881 (4th Cir. 1996).

Having established that Murray's claims of discrimination are arbitrable, the court then engages in a limited inquiry into the existence of "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Seizing on the court's equitable powers, Murray argues that the arbitration agreement is unconscionable. As Murray agreed to arbitrate his discrimination claims, the burden of

13

proving the arbitration agreement unconscionable lies with Murray, the party seeking to avoid arbitration. *Green Tree*, 531 U.S. at 91-92.

### A.

The majority holds that the arbitration agreement is unconscionable because the arbitrator is selected from a list of arbitrators provided by the Union. In considering an unconscionability challenge, federal courts must remember that "[u]nconscionability is a narrow doctrine whereby the challenged contract must be one which no reasonable person would enter into, and the inequality must be so gross as to shock the conscience." *Sydnor*, 252 F.3d at 305 (citations and internal quotations omitted).

While the arbitration agreement does not specify *how* the Union will obtain its list of arbitrators, this omission does not make the contract facially unconscionable. While the agreement's silence *could* be read as allowing the Union to choose a biased arbitrator, a careful reading of the arbitration agreement and the record does not indicate that the Union is attempting to saddle Murray with a biased arbitrator. Placing the responsibility of providing an arbitrator list with the Union recognizes that the Union, as a repeat player in the arbitration process, has better access to methods for obtaining a list of arbitrators than Murray.[1] While the Union admittedly could have drafted a more precise arbitration agreement, the agreement's ambiguity does not make the contract sufficiently oppressive to render it unenforceable. Indeed, absent extraordinary circumstances, mere ambiguity of a contract term is not the type of provision which can be said to "shock the conscience." *Sydnor*, 252 F.3d at 305.

In short, Murray does not argue that the arbitration agreement will

_____

[1] The record indicates that the President's office does not maintain or draft a list of arbitrators. Instead, when arbitration is demanded pursuant to a collective bargaining agreement or a dispute by a Union employee, the Union obtains a list of arbitrators from the American Arbitration Association or the Federal Mediation and Conciliation Service. The arbitration association then sends the President a list of randomly selected arbitrators. (J.A. 215-16, 360-402). In disputes involving employees and the Union, the Union pays the fees charged by the AAA. (J.A. 399-400).

14

necessarily produce a biased arbitrator pool, but that the contract's silence creates the *risk* that the pool of arbitrators will be biased. However, the United States Supreme Court's decision in *Green Tree Financial Corporation-Alabama v. Randolph*, 531 U.S. 79 (2000), counsels that an "arbitration agreement's silence" as to arbitration terms and procedures, standing alone, "is plainly insufficient" to make the arbitration agreement unenforceable. *See id.* at 91 (concluding that arbitration agreement silent as to payment of arbitration fees and costs was not facially unenforceable).

Speaking for the majority, Chief Justice Rehnquist concluded that unsupported fears and unfounded assumptions that high arbitration costs would prevent a party from vindicating federal rights was "too speculative to justify the invalidation of an arbitration agreement." *Id.* Randolph, the individual opposing arbitration in *Green Tree*, submitted evidence of fees typically charged by leading arbitration associations and of fees incurred in other arbitration cases. The court rejected this evidence as speculative, stating that Green Tree, the party requesting arbitration, had not selected an "arbitration associate or arbitrator to resolve" the parties' dispute and also noting the possibility that the arbitrator's fee would be waived. *Id.* at 91 n.6. Finding no evidence other than the "arbitration agreement's silence" as to allocation of arbitration costs, the Court concluded that the "risk that [a party would] be saddled with prohibitive cost [was] too speculative to justify invalidation of an arbitration agreement." *Id.* at 91.

I find this case closely analogous to *Green Tree* because Murray presents a "what-if" scenario similar to the argument the Supreme Court rejected in *Green Tree*. Murray attempts to show that the arbitration agreement's silence as to the Union's method for selecting an arbitrator pool creates an unacceptable risk that Murray will face a biased arbitrator. However, rather than pointing to evidence showing a likelihood that the Union will produce a biased arbitrator pool, Murray asks the court to base its decision on his tenuous and unsupported assertions. The majority's decision to invalidate the arbitration agreement based on a speculative risk of bias is, in my view, inconsistent with *Green Tree*.

Neither is the majority's opinion compelled by the Fourth Circuit's decision in *Hooters of America v. Phillips*, 173 F.3d 933 (4th Cir.

15

1999). *Hooters* represents the "limited circumstances" in which an arbitration agreement containing a multitude of egregiously biased rules and procedures demonstrated one party's intent to make a mockery of the arbitration system. *Id.* at 938; *Sydnor*, 252 F.3d at 306. The court in *Hooters* also warned that the decision should not be construed as "a full-scale assault on the fairness of proceedings before the matter is submitted to arbitration." *Hooters*, 173 F.3d at 941.

Unlike the arbitration agreement in this case, the arbitration agreement in *Hooters* required the employee to provide notice of the specific nature of the claims, the specific acts or omissions on which the employee's claims were based, and a list of all the employee's factual witnesses with a summary of the facts known to them. *Id.* In contrast, Hooters did not have to file responsive pleadings, notice of its defenses, or provide a list of its witnesses. *Id.* In fact, only Hooters could expand the scope of arbitration to matters not raised in the employee's claim, and only Hooters could move for summary dismissal prior to a hearing. *Id.* at 939. Hooters also exercised complete control in determining whether to create an official record of the arbitration hearing for appellate review and could even cancel the arbitration agreement with thirty days notice. *Id.* Moreover, once the arbitrator made its decision, Hooters, but not the employee, could seek vacatur or modification of the award by showing by a preponderance of evidence that the arbitration panel acted outside its authority. *Id.*

The only similarity between Hooters and this case involves the selection of the arbitrator. In *Hooters* the arbitration rules provided that the parties were to choose a three-panel arbitration board from a list of "Approved Arbitrators" compiled, maintained, and "created exclusively by Hooters." *Id.* at 938-39; *Hooters of Am. v. Phillips*, 39 F. Supp. 2d 582, 601 (D.S.C. 1998). In this case, the arbitration agreement states that the Union will provide a list of arbitrators (J.A. at 5), but says nothing about the Union's right or intent to exercise independent control over the arbitrator pool. Thus, the arbitration agreement in Hooters is distinguishable from the agreement in this case.

However, even if the arbitration agreement in *Hooters* had contained the same language to which Murray now objects, I do not believe *Hooters* would have been decided differently or would have

16

compelled the majority's invalidation of this arbitration agreement. *Hooters* is based on the cumulative effect of a number of one-sided rules and procedures demonstrating that Hooters' "only possible purpose" in establishing its arbitration rules "was to undermine the neutrality of the [arbitration] proceeding." *Hooters*, 173 F.3d at 939; *see also Sydnor*, 252 F.3d at 306 (noting that unconscionability ruling in *Hooters* was based on "multitude of biased and warped rules" and provided example of limited circumstances in which unconscionability finding was appropriate). Indeed, the violations in *Hooters* were so severe that the court granted the extraordinary equitable remedy of rescinding the entire contract. *Hooters*, 173 F.3d at 940 (noting that Hooters' breach was "by no means insubstantial" but involved contractual performance "so egregious that the result was hardly recognizable as arbitration at all"). Faced with overwhelming evidence that Hooters never intended to provide its employees with a fair and unbiased arbitration forum, the *Hooters* court concluded that the agreement and procedures were so egregious and oppressive as to "shock the conscience." This reading of *Hooters* is consistent with *Green Tree* because the Hooters' employees, unlike Murray, pointed to a plethora of one-sided and flagrantly unfair rules, thus taking their allegations of unconscionability outside the realm of speculation, and into the arena of a demonstrative likelihood of harm.

*Hooters* also recognizes that a party with the responsibility of setting arbitration rules and procedures has a contractual duty to do so in good faith. *Hooters*, 173 F.3d at 938. The court in *Hooters* concluded that the promulgation of vast numbers of unfair and biased rules was not only unconscionable, but breached the duty of good faith. *Id.* at 940. In contrast, Murray has failed to point to rules and procedures promulgated in bad faith, or even evidence of an anticipatory breach by the Union in performing its contractual duty to provide a list of neutral arbitrators. As the Union indicated to the district court, it ultimately obtained a list of arbitrators from an outside source, the American Arbitration Association ("AAA").[2] In invalidat-

_____

[2] The Union selected the AAA to provide an arbitrator list because the Federal Arbitration and Conciliation Service only provides arbitrators for disputes between employers and unionized employees. (J.A. 254). The AAA is a large, non-profit organization which was used as a model in

17

ing the arbitration agreement, the majority presumes that the Union will carry out its contractual obligation to provide a neutral arbitrator in bad faith. However, in accordance with ordinary contract principles, I believe it is entirely proper to presume, prior to arbitration and without evidence suggesting otherwise, that both parties will act in accordance with their contractual duties of good faith and fair dealing.

While I do not believe that Murray has shown an arbitration agreement containing egregious terms even remotely close to those cited in *Hooters* or bad faith by the Union, his failure to demonstrate unconscionability or breach of contract prior to arbitration does not leave him without recourse. If the Union skewed the arbitration pool in its favor, Murray has the right to return to court postarbitration to show arbitrator bias and seek vacatur of the arbitration award under 9 U.S.C. § 10, a scenario contemplated by the Court in *Green Tree*. *See Green Tree*, 531 U.S. at 97 (Ginsberg, J., dissenting) (noting that majority opinion did not foreclose party from challenging arbitration costs postarbitration).[3] However, postarbitration review is not the basis of the majority's opinion.

### B.

Finally, the majority notes in passing that the arbitration rules are one-sided because an employee, reading the arbitration agreement and Union's bylaws together, might believe a decision favorable to the

_____

striking down Hooters' arbitration agreement. *See Hooters*, 173 F.3d at 939-40. Murray presented little evidence supporting his accusation that the AAA's policies and procedures yield biased arbitrators. Thus, the majority's suggestion that Murray's arbitrator was "hand-picked" by the Union, *supra* at 7, is not supported by the record.

[3] While Murray asserts that the arbitration he ultimately received was biased, his post-arbitration claims of actual bias were limited to his argument that the arbitration was biased because the Union paid all of the arbitrator's fees. (J.A. 403-05). The majority's decision does not discuss this issue as a basis for its opinion. Moreover, my reading of the claims presented to the district court does not find support for the majority's suggestion that Murray ultimately received an arbitrator who was actually biased. *See supra* at 9.

18

employee could be ignored by the President. *See supra* at 7. First, whether a document is unconscionable does not turn on an employee's subjective beliefs about the arbitration agreement. Second, while courts have refused to enforce arbitration agreements *specifically* allowing employers to ignore arbitrators' decisions, the Fourth Circuit in *O'Neil v. Hilton Head Hospital*, 115 F.3d 272 (4th Cir. 1997), refused to read such a provision into an arbitration agreement when the employer consistently agreed that arbitration was binding on both parties. *Id.* at 275. I would apply the reasoning in *O'Neil* with equal force to a party's attempts to infuse an arbitration agreement with implied limits on an arbitrator's decisionmaking and enforcement authority. As neither the arbitration agreement nor the Union bylaws give the President the power to ignore or circumvent the arbitrator's decision, I would refuse to read unconscionable terms into the agreement.

## II.

For the foregoing reasons, I respectfully dissent from the majority's decision in Part II, and would affirm the district court's opinion dismissing Murray's Title VII claims and compelling arbitration. I concur with the majority's decision in Part III reversing the district court's dismissal of Murray's state laws claims.

19