IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 28, 2006 Session

# ZACHARY ROSENBERG, M.D., ET AL. v. BLUECROSS BLUESHIELD OF TENNESSEE, INC., ET AL.

### Appeal from the Chancery Court for Davidson County
### No. 02-1237-III    Ellen Hobbs Lyle, Chancellor

No. M2005-01070-COA-R9-CV - Filed on November 29, 2006

This appeal results from the trial court's order granting a Motion to Compel Arbitration. Two doctors, Zachary Rosenberg, M.D. and Dewayne P. Darby, M.D., sued BlueCross BlueShield of Tennessee ("BCBST") and the Tennessee Healthcare Network alleging breach of contract, seeking class action status, and requesting injunctive relief under the Tennessee Consumer Protection Act. From the trial court's order compelling arbitration, the doctors appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which JERRY SCOTT, SR., J., joined. WILLIAM C. KOCH, JR., P.J., M.S., filed a separate concurring opinion.

Edith M. Kallas, New York, New York; David L. Steed, Nashville, Tennessee, for the appellants, Zachary Rosenberg, M.D. and Dewayne Darby, M.D.

Gary C. Shockley, John S. Hicks, Mary Ann Miranda, Nashville, Tennessee for the appellees, BlueCross BlueShield of Tennessee, Inc., and Tennessee Healthcare Network, Inc.

## OPINION

## I. FACTS

Zachary Rosenberg, M.D., an otolaryngologist in Memphis, and Dewayne P. Darby, M.D., a family practitioner in Jefferson City, entered into separate agreements with Blue Cross Blue Shield of Tennessee. These Participating Physician Agreements were drafted by BCBST for the purpose of obtaining the doctors' medical services for BCBST enrollees. The physicians alleged in their complaint that over the course of the contract period BCBST systematically and arbitrarily denied reimbursement for medically necessary charges claimed by the physicians and by other similarly situated medical service providers for otherwise medically necessary procedures. The doctors allege fourteen different types of conduct constituting breach of contract, unfair or deceptive business

practices, and otherwise oppressive conduct, which would entitle the doctors to compensatory damages and permanent injunctive relief.

A. Contracts

The contracts which give rise to the appellants' complaint in Chancery Court were formed in connection with BCBST's provision of health insurance benefits to its enrollees. As part of the provision of these medical services, BCBST, along with Tennessee Healthcare Network, Inc., contracted with medical providers like Drs. Rosenberg and Darby. In order to participate in BCBST's network of physicians and to treat BCBST patients, these doctors who chose to enter into a Physician Agreement signed the same form contract prepared by BCBST. This document included the following provisions as of December 20, 2000:

> **8.2** **Arbitration.** If a dispute, other than a dispute for which the resolution is provided for in the Utilization Review Program, arises between the parties of this Agreement involving a contention by either party that the other has failed to perform its obligations and responsibilities under this Agreement, then the party making such contention shall promptly give written notice to the other. Such notice shall set forth in detail the basis for the party's contention, and shall be sent by certified mail, with a return receipt requested. ...[I]f the party that gave notice of dissatisfaction remains dissatisfied, then the party shall so notify the other party and the matter shall be promptly submitted to inexpensive and binding arbitration in accordance with the Tennessee Uniform Arbitration Act at Tennessee Code Annotated Section 29-5-301 *et seq*.
>
> . . .
>
> **14.9** **Amendment.** Except as otherwise provided below, this Agreement, or any part, article, section, exhibit, or Network Attachment hereto, may be amended, altered, or modified only in writing as duly executed by both parties. However, ... a change ...(ii) to BCBST policies or procedures..., shall be automatically incorporated herein to the extent the services rendered by the Physician pursuant to this Agreement are affected by such removal or change, and shall not be deemed an amendment to this Agreement, subject to the right of the Physician to terminate this Agreement without cause as provided in Section 12.2. In addition, and notwithstanding the foregoing, BCBST shall have the right to amend this Agreement in accordance with the following procedure:
>
> **14.9.1** BCBST shall furnish physician with the proposed amendment in writing;
>
> **14.9.2** Physician shall have thirty (30) days after delivery of the proposed amendment in which to respond in writing to BCBST. If Physician either accepts such amendment or fails to respond in writing within such period, the proposed amendment shall become effective and therefore binding on

Physician upon the earlier of the Physician's written acceptance or the expiration of such thirty (30) day period; and

**14.9.3** If Physician notifies BCBST in writing by certified mail within thirty (30) days after the delivery of the proposed amendment that Physician does not accept the proposed amendment, such amendment shall not take effect and BCBST shall have the right to elect either (I) to have this Agreement remain in effect in accordance with its terms without the proposed amendment or (ii) to terminate this Agreement by giving written notice fifteen (15) days prior to the effective date of termination.

In addition to the Physician Agreement signed by the doctors, BCBST provided access to a "Commercial Provider Administration Manual, which defined "binding arbitration" as that term is used in the Agreement:

    **A.**      **PROVIDER DISPUTE RESOLUTION PROCEDURE**
    **I.**        **INTRODUCTION.**

        A.      This Procedure describes the exclusive method of resolving any Disputes related to a Provider's participation in BCBST's network(s). It is incorporated by reference into the participation agreement between the parties (the "Participation Agreement") and shall survive the termination of that Agreement.

. . .

        G.      A party must commence an action to resolve a Dispute pursuant to this procedure statement within two (2) years after the date of the event causing that Dispute occurred (e.g. the date of the letter informing the Provider of a determination). This provision shall not extend the period during which a Participating Provider must submit a claim to BCBST pursuant to applicable provisions of the provider's agreement(s) with BCBST, although the Provider may commence a dispute related to the denial of a claim that was not filed in a timely manner within two years after receiving notice of the denial of that claim. If BCBST discovers a matter creating a Dispute with a Participating Provider during an audit, it shall have two years from the conclusion of that audit to initiate a Dispute concerning that matter. The failure to initiate a Dispute within that period specified in this subsection shall bar any type of action related to the event causing that Dispute, unless the parties agree to extend the time

period for initiating an action to resolve that Dispute pursuant to this procedure statement.

**H.** **ALL DISPUTES WILL BE SUBJECT TO BINDING ARBITRATION IF THEY CAN NOT BE RESOLVED TO THE PARTIES' SATISFACTION PURSUANT TO SECTIONS II (A-C) OF THIS PROCEDURE STATEMENT.**

. . .

**II.** **DESCRIPTION OF THE DISPUTE RESOLUTION PROCEDURE**
**D.** **BINDING ARBITRATION.**

If the parties do not resolve their Dispute, either party may make a written request that the Dispute be submitted to binding arbitration within thirty (30) days after it receives a response to its request for reconsideration or the conclusion of the mediation of that Dispute. Unless the parties otherwise agree, the Dispute shall be arbitrated in accordance with current AAA Commericial Arbitration Rules, in Chattanooga, Tennessee. The arbitration will be conducted by a panel of three (3) qualified arbitrators, unless the parties agree otherwise. The arbitrators may sanction a party, including ruling in favor of the other party, if appropriate, if a party fails to comply with applicable procedures or deadlines established by those Arbitration Rules.

Each party shall be responsible for one-half of the arbitration agency's administrative fee, the arbitrators' fees and other expenses directly related to conducting that arbitration. Each party shall otherwise be solely responsible for any other expenses incurred in preparing for or participating in the arbitration process, including that party's attorney's fees.

The arbitrators: shall be required to issue a reasoned written decision explaining the basis of their decision and the manner of calculating any award; may not award punitive, or exemplary damages; may not vary or disregard the terms of the Provider's participation agreement, the certificate of coverage and other agreements, if applicable; and shall be bound by controlling law; when issuing a decision concerning the Dispute. The arbitrators' award, order or judgment shall be final and binding upon the parties. That decision may be entered and enforced in any state or federal court of competent jurisdiction. That arbitration award may only be modified, corrected[, or] vacated for the reasons set forth in the United States Arbitration Act ( 9 USC § 1).

**E.** **EFFECTIVE DATE**

This procedure statement was adopted by BCBST on June 1, 1997. This arbitration provision supersedes any prior arbitration clause or provision contained in any other document. This arbitration clause may be modified or amended by BCBST and the Provider will receive notice of any modifications through updates to the Provider Manual.[1]

## B. Performance

Pursuant to the agreements, the doctors would customarily treat enrollee/patients and then seek reimbursement through a claims process based on "current procedural technology" or "CPT" codes. The CPT codes were designed by the American Medical Association and adopted by the federal Center for Medicare and Medicaid Services for the purpose of easily identifying the type of service performed, the general requirement of expertise and resources, and the complicated or routine nature of the billed procedure. These claims were transmitted to BCBST, who would then review the request and grant or deny the claim based on several factors, including a determination of the medical necessity of the procedure.

## II. PROCEEDINGS IN THE TRIAL COURT

In their Complaint filed April 25, 2002, Drs. Rosenberg and Darby sought class action certification alleging that they and similarly situated medical providers were the victims of a continued scheme of unfair and deceptive business practices on the part of BCBST and its subsidiary the Tennessee Healthcare Network. The 32-page Complaint contains the following specific averments:

4.  As discussed in detail below, defendants have employed a variety of means to effect their improper and deceptive scheme, including, but not limited to, one or more of the following practices:

Defendants systematically deny reimbursement to TMA members for medically necessary services by, *inter alia*, (I) routinely and unjustifiably refusing to pay for, or reducing payment for, more than one healthcare service per visit or incident, referred to as "bundling"; (ii) routinely and unjustifiably reducing retroactively the amount of reimbursement remitted to TMA members, referred to as "downcoding"; (iii) routinely and unjustifiably denying increased levels of reimbursement for complicated medical cases which require TMA members to expend extra time and resources on the treatment of the patient referred to as "modifiers"; and (iv) routinely and unjustifiably refusing to pay for treatments by

---

[1]The Provider Dispute Resolution Procedure was amended by November 1, 2003 to alter time limits in the procedure and to restrict the remedies to exclude treble or extracontractual damages. In addition, the policy provided that the arbitrators could only reverse a BCBST attempt at resolving the dispute upon a showing that BCBST acted arbitrarily or capriciously.

physician specialists by falsely claiming that referrals were not obtained from patients' primary care physicians.

Defendants systematically deny payment to TMA members for medically necessary claims to achieve internal financial targets without regard for individual patients' medical needs by, *inter alia*, (I) improperly employing software programs to automatically downcode procedures and/or deny payment to physicians identified as "high utilizers" without any clinical review, oversight or justification; (ii) engaging in physician profiling for the purpose of penalizing physicians who provide services in excess of BCBS-TN's arbitrary "targets"; and (iii) improperly applying so-called "guidelines" in a manner that BCBS-TN knows is unreasonable for the purpose of denying payment for coverage for medically necessary treatments.

Defendants fail to provide adequate staffing to handle TMA members' inquiries. In this regard, BCBS-TN has created and maintains an inefficient administrative system designed to frustrate payment to plaintiffs by requiring physicians to make excessive telephone inquiries to obtain proper reimbursement of claims.

Defendants routinely and unjustifiably fail to make payments to TMA members within the time period prescribed by applicable provisions of Tennessee State law, and routinely and unjustifiably fail to pay interest on past-due claims required under applicable provisions of Tennessee State law.

Defendants fail to provide sufficient explanation for their payment denials and reductions.

Defendants consistently refuse to provide participating physicians with BCBS-TN's fee schedules for Current Procedures Terminology Codes ("CPT") (the codes recognized by physicians and insurers for reimbursement).

Defendants require physicians to enter into one-sided physician agreements in order for them to provide medical care to patients who receive healthcare through defendants' managed care plans.

5.    As a result of their improper, unfair and/or deceptive scheme, defendants have deprived TMA members of millions of dollars of lawful reimbursement for healthcare services provided to defendants' plan members.

6.    Adequate and timely reimbursements to TMA members are necessary to ensure that physicians are able to maintain their practices to provide medically sound care to patients. The delivery of healthcare services promised by defendants depends on reimbursement adequate to cover the costs of delivering such healthcare.

-6-

Defendants' failure to provide reimbursement to TMA members which is adequate to cover the costs of delivering healthcare services to BCBS-TN's enrollees has resulted in tremendous hardships for defendants' participating physicians.

Of particular note is the relief sought in the Complaint:

WHEREFORE, plaintiffs demand that, upon trial by jury, this Court enter judgment against defendants as follows:

a        Declaring that defendants' practices, as described herein, constitute deceptive acts and practices that are unlawful under the Tennessee Consumer Protection Act of 1977, and awarding plaintiffs and the Class compensatory or actual damages and/or treble damages;

b        Declaring that defendants breached the terms of their contracts, as described herein, and awarding plaintiffs and the Class compensatory or actual damages;

c        Declaring that defendants' practices as described herein violate T.C.A. § 56-7-109 and awarding plaintiffs and the Class compensatory or actual damages and/or punitive damages;

d        Awarding plaintiffs punitive damages;

e        Awarding plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

f        Declaring that this action is a proper class action and certifying an appropriate plaintiff class pursuant to Tenn.Civ.Proc.Rule 23;

g        Awarding plaintiffs permanent injunctive relief prohibiting, restraining, and enjoining defendants from engaging in the conduct complained of herein, including, inter alia:

(I)        continuing to direct their internal agents to reduce or fully deny reimbursement without regard to the validity or necessity of the services provided;

(ii)       continuing to employ so-called "guidelines" in an improper manner to deny claims for reimbursement;

(iii)      continuing to bundle claims for separate procedures thereby denying TMA members all or part of the payment due for some procedures;

(iv)      denying payment of modifiers for complicated medical cases that involve excessive time and resources;

(v)       continuing to downcode procedures performed by TMA members;

(vi)      continuing to use software that automatically downcodes healthcare services provided by TMA members;

(vii)     failing to pay specialists for lack of a referral when a referral was submitted;

(viii) continuing to deny reimbursement to TMA members who are identified as "high utilizers";

(ix) continuing to violate provisions of Tennessee statutory law regarding payment and interest;

(x) forcing physicians and their staff to expend unreasonable amounts of time and resources attempting to obtain the reimbursement to which they are entitled;

(xi) failing to provide adequate explanations for the denial of claims for reimbursement;

(xii) failing to ensure that procedures exist so that physicians' claims for reimbursement are appropriately and adequately considered in a timely manner, both initially and in the appeals process;

(xiii) exploiting the parties' unequal bargaining power in order to force physicians to enter into one-sided contracts on a take-it-or-leave-it basis;

(xiv) failing to provide for adequate staffing to handle TMA physician inquiries;

(xv) refusing to provide participating physicians with fee schedules to be applied to CPT codes recognized by physicians and insurers for reimbursement;

(xvi) continuing arbitrary corporate policies and test requirements for denying payments for specific types of medically necessary treatments;

(xvii) otherwise interfering with or obstructing the right to full and timely reimbursement to TMA members; and

h. Granting such other and further relief as the Court deems just and proper.

It is well to note that the relief sought far outstrips the value of the individual claims. It is for this very reason that the doctors sought to aggregate and establish a class of affected plaintiffs. The demand itself reveals that the individual claims that remain underpaid or unreimbursed are not the real issues in the case which involve the burden to all participating providers created by BCBST's use of the dispute resolution procedure leading up to and including arbitration.

A. The Motion to Arbitrate

In response to the Complaint, BCBST filed its Motion to Compel Arbitration and to Dismiss or Stay Pending Arbitration on May 28, 2002. Discovery commenced pending the resolution of the Motion, and various discovery skirmishes occupied the parties and the court until the entry of the first of two orders specifically addressing the Motion to Compel Arbitration. The doctors resisted the Motion arguing that the arbitration procedure described in BCBST's Dispute Resolution Procedure ("DRP") was illusory due to its cost-prohibitive nature and unenforceable as part of a contract of adhesion. In the first order entered December 1, 2004, the trial court specifically found that the physician agreement was not a contract of adhesion. However, the trial court indicated that the arbitration procedure described in the DRP was cost-prohibitive. The court requested additional

briefing on the question of whether the "inexpensive arbitration clause" was unenforceable as "illusory."

## B. The Second Order

On February 3, 2005, after receiving supplemental briefs, the court made an apparent about-face and entered an order granting the Motion to Compel Arbitration. That order contains the following language:

> The one issue which the Court was unable to decide on the first papers submitted was whether the clauses requiring the physicians to submit their dispute to arbitration were unenforceable because the costs of arbitration versus court were so expensive as to deter or prevent the plaintiffs from redressing their claims. The plaintiffs' argument that arbitration was cost prohibitive was one plank in the plaintiffs' challenges to the enforceability of the arbitration clauses. The plaintiffs' other challenge to the enforceability of the arbitration clause made in their first papers was that the arbitration clause was a contract of adhesion. The Court rejected that argument.[1] Thus the only argument of the plaintiffs left was the issue of arbitration being cost prohibitive. Unsure whether this argument on its own could provide a basis for not enforcing the arbitration clauses, the Court requested additional briefing.
>
> [1]Tracking the law established in *Buraczynski v. Eyring,* 919 S.W.2d 314 (1996) and *Vickery Transp., Inc. V. HEPACO, Inc.,* 2004 WL 2280421, the Court concluded that the plaintiffs' argument that Blue Cross/ Blue Shield's Tennessee Market share of 20 to 40 percent is not the kind of factor to be used in evaluating the relative bargaining power of parties to an arbitration agreement and does not provide a basis on which to conclude that the arbitration clause is a contract of adhesion.
>
> After having reviewed the supplemental briefs and having studied the case law, the Court concludes that the plaintiffs' argument that arbitration is cost prohibitive does not apply to the lawsuit pending before this Court, and, therefore, is not a basis on which to deny arbitration. More briefing is needed on TMA's claims. The Court's reasoning and order is as follows.
>
> The issue before the Court derives from the U.S. Supreme Court's statement in *Green Tree Financial Corp. – Alabama, et al. v. Larketta Randolph*, 351 U.S.79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), "It may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating . . . right . . . ." *Green Tree's* progeny in the federal circuit courts has contoured what kind of facts of arbitration expense versus court expense a party opposing arbitration must demonstrate to authorize a court to "red-line" an arbitration clause or not require a ~~party~~ to submit to arbitration.
>
> In the case at bar the plaintiffs do not specifically address the cost of arbitrating this case – a lawsuit alleging numerous and systematic deceptive acts,

breaches of contracts, failures to promptly pay and unjust enrichment. Instead, the plaintiffs argue that the costs of arbitrating each individual claim of a physician for underpayment or reimbursement – which claims are the wrongful and deceptive acts that make up and constitute some of the facts and evidence of this lawsuit – is cost prohibitive such that the physicians do not have a viable forum or remedy to redress these small claims. The illusory arbitration clauses of these underlying claims, the plaintiffs appear to argue, merit not forcing the plaintiffs in this case to arbitration.

. . .

The Court concludes, however, that even if it were to determine that the arbitration clauses as applied to individual physicians' small claims are cost prohibitive and therefore illusory, this Court can not use that determination to set aside the application of the arbitration clauses to this case. Instead, this Court understands from its review of the case law the relevant inquiry is whether the cost of arbitration of this case: the multiple claims of wrongdoing and deception and the causes of action before the Court of violation of the Tennessee Consumer Protection Act, unjust enrichment, violation of the Tennessee Prompt Pay Act and breach of contract, is cost prohibitive such that arbitration does not provide the plaintiffs a viable forum or remedy. In identifying this Court's focus, it relies upon and is guided by *Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549 (4th Cir.2001) in which the court held that the appropriate inquiry for determining whether an arbitration clause is unenforceable due to costs is "a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether the cost differential is so substantial as to deter the bringing of claims." *Id.* at 556. Additionally, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001); *Livingston v. Associates Finance, Inc.*, 339 F.3d 553 (7th Cir.2003); *Musnick v. King Motor Co. of Fort. Lauderdale*, 325 F.3d 1255 (11th Cir.2003); *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir.2003), all require specific, concrete proof of costs not speculation. From these sources, the Court concludes that the costs it must assess are the costs of arbitrating the lawsuit before it: alleged systematic, deceptive and numerous acts of underpayment, not the costs of arbitrating separately each underlying claim of underpayment and whether, based on those claims, arbitration provides the plaintiffs a viable forum.

. . .

This Court, therefore, concludes that the plaintiff physicians have failed to demonstrate that the cost of arbitrating the above-captioned lawsuit is prohibitively more expensive than a judicial forum. The Court grants the defendants' motion to compel the plaintiff physicians to arbitrate their claims asserted in this lawsuit. The claims of the physicians of the defendants' deception and wrongful conduct, including the claims that the arbitration clauses of each physician contract are illusory as cost prohibitive for individual claims, shall be determined in arbitration.

C.  Interlocutory Appeal Issues

In an order entered April 25, 2005, the trial court denied a Motion to Alter, Amend and Clarify filed by doctors Rosenberg and Darby and granted the doctors' Rule 9 Motion for Interlocutory Appeal. That order contains the following pertinent provisions:

The Court denies the plaintiffs' motion to alter, amend and clarify the February 3, 2005 order compelling the plaintiff[s] to arbitrate their claims. The reasons for the Court's denial are as follows:

1. The Court maintains its conclusion stated in the February 3, 2005 order that the plaintiffs have not carried their burden of demonstrating that the cost of arbitrating the above-captioned matter is prohibitively more expensive than court proceedings. In reaching that conclusion in the February 3, 2005 order and in reaffirming that conclusion herein, the Court has not analyzed this case and costs and damages in terms of a class action. The Court has conducted its analysis concerning the cost of arbitration by considering only the claims of each plaintiff, Rosenberg and Darby. Also, in reaching the determination to deny the plaintiffs' motion to alter, amend and clarify, the Court has not considered new affidavits filed in support of the plaintiffs' motion, those being affidavits of Betty Prescott and Beth Glenn. The plaintiffs have failed to provide a sufficient explanation to the Court why the facts set out in these affidavits were not available to the plaintiffs at the time the hearing on the motion took place on November 4, 2004, nor how the plaintiffs exercised due diligence to secure the evidence prior to the hearing. *Robinson v. Currey*, 153 S.W.3d 32 (Tenn.Ct.App.2004); *Seay v. City of Knoxville*, 654 S.W.2d 397 (Tenn.Ct.App.2003).

As to the plaintiffs' motion for a Rule 9 interlocutory appeal, the Court grants the motion on the sole basis of the need to develop a uniform body of law. There is very little law in Tennessee developing and interpreting the *Greentree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000) exception to arbitration where the arbitration is cost prohibitive. Because of this absence of law in Tennessee and on that basis alone, the Court grants the interlocutory appeal. This Court is convinced it has correctly decided this case applying the *Greentree Financial* standard and cases from other jurisdiction.

During the pendency of the Rule 9 appeal this Court shall not stay its order compelling arbitration. Arbitration shall proceed in tandem with the pursuit of the Rule 9 appeal.

On May 25, 2005, this Court granted the doctors' Rule 9 application as to the sole issue on appeal at that time, whether the parties' arbitration is unenforceable "because the costs of arbitration are so expensive as to deter or prevent the plaintiffs from redressing their claims." On June 23, 2005, we granted the Appellants' Motion to Clarify or Amend and expanded the issues on appeal to include the following:

(1)     Whether the trial court incorrectly ruled that "the arbitration clauses are not part of a contract of adhesion."

(2)     Whether the trial court incorrectly ruled that the defendant's substantial market share is "not the kind of factor to be used in evaluating the relative bargaining power of the parties to an arbitration agreement and does not provide a basis to deny arbitration."

## III. The Metamorphosis of Arbitration

Seldom has a time-honored rule of common law been so decisively reversed and supplanted by an even stronger statutory mandate to the contrary than is evidenced by the present exalted status of arbitration. The Federal Arbitration Act enacted by Congress in 1925 (9 USC §§ 1-14) was enacted for the specific purpose of overturning the Common Law Rule under which agreements to arbitrate were rendered impotent. As observed by the Supreme Court of the United States, the reason motivating the Congress to enact the Federal Arbitration Act was carefully explained in HR Rep. No. 96, 68th Cong, 1st Sess, page 1 (1924).

> According to the Report:
> "The need for the law arises from an anachronism of our American law. Some centuries ago, because of the jealousy of the English courts for their own jurisdiction, they refused to enforce specific agreements to arbitrate upon the ground that the courts were thereby ousted from their jurisdiction. This jealousy survived for so long a period that the principle became firmly embedded in the English common law and was adopted with it by the American courts. The courts have felt that the precedent was too strongly fixed to be overturned without legislative enactment, although they have frequently criticised the rule and recognized its illogical nature and the injustice which results from it. This bill declares simply that such agreements for arbitration shall be enforced, and provides a procedure in the Federal courts for their enforcement." HR Rep No. 96, 68th Cong, 1st Sess, 1-2 (1924).

*Dean Witter Reynolds, Inc. v. Byrd*, 470 US 213, 84 L.Ed.2d 158, 164-165, 105 S.Ct. 1238 (1985).

Any doubt as to the scope of the Federal Arbitration Act has been likewise set to rest by the U.S. Supreme Court.

> Section 2 is a Congressional declaration of a liberal federal policy favoring arbitration agreements, not withstanding any state's substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.
>
> . . .

> The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is in the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Moses H. Cone Hosp. v. Mercury Constr. Corp.*, 460 US 1, 24-25, 74 L.Ed.2d 765, 103 S.Ct. 927 (1982).

That the Federal Arbitration Act displaces non-conforming state law and is binding on state courts is equally well settled by *Southland Corp. v. Keating*, 465 US 1, 79 L.Ed.2d 1, 104 S.Ct.852 (1984). *Keating* was determined over the vigorous dissenting opinion of Justice O'Connor and Justice Rehnquist, who were subsequently joined in dissent by Justices Scalia and Thomas. *Allied-Bruce Terminex Co. v. Dobson*, 513 US 265, 130 L.Ed.2d 753, 115 S.Ct. 834 (1995). By the time *Allied-Bruce Terminex* was decided in 1995, Justice O'Connor, maintaining her personal views as expressed in *Keating* surrendered to *stare decisis* and concurred in the *Keating* rule. Even the combative Justice Scalia announced that he was forsaking further dissent from the rule in *Southland v. Keating*, but uttered a conditional "I shall return". Said Justice Scalia, "I will, however, stand ready to join four other justices in overruling it." *Allied-Bruce*, 513 US at 285 (Scalia, J. dissenting). Only Justice Clarence Thomas remained unmoved against the tide of *Southland v. Keating*.

States are thus compelled to submit to the dictates of the Federal Arbitration Act, but as observed by the Supreme Court of Tennessee, the Federal Act only applies to arbitration agreements and the parties to a contract remain free to structure their arbitration agreements as they see fit. They may likewise limit by their contract the issues which they choose to arbitrate and may specify the rules under which that arbitration will be conducted. *Frizzell Const. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79 (Tenn.1999).

> The FAA's "proarbitration policy does not operate without regard to the wishes of the contracting parties." *Mastrobuono*, 514 U.S. at 57, 115 S.Ct. 1212. Because "arbitration is a matter of contract[,] . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S.643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). When parties agree to arbitration, the FAA ensures enforcement of that agreement by withdrawing "the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp.*, 465 U.S. at 10, 104 S.Ct. 852. However, consistent with the FAA, parties may agree that only certain issues will be submitted to arbitration or that they will not arbitrate at all. *Cf. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

> Therefore, the question essentially becomes "what the contract has to say about the arbitrability of petitioner's claim. . . ." *Mastrobuono*, 514 U.S.at 58, 115 S.Ct. 1212. If the parties in this case agreed to arbitrate the claim of fraudulent

inducement, then despite such a prohibition under Tennessee law, the claim must be submitted to arbitration. Conversely, if the parties did not agree to arbitrate the claim of fraudulent inducement, then they can not be compelled to arbitrate the claim despite its arbitrability under the FAA.

*Frizzell Const. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 84 (Tenn.1999).

## IV. ANALYSIS

As a general rule, a court's enforcement of an arbitration provision is reviewed *de novo*. *See Cooper v. MRM Inv. Co.,* 367 F.3d 493, 497 (6th Cir. 2004). A trial court's order on a motion to compel arbitration addresses itself primarily to the application of contract law. We review such an order with no presumption of correctness on appeal. *See Pyburn v. Chevrolet,* 63 S.W.3d 351, 356 (Tenn.Ct.App. 2001); *see also Nelson v. Wal-Mart Stores, Inc.,* 8 S.W.3d 625, 629 (Tenn. 1999). However, to the extent that findings of fact are necessary concerning the "cost-prohibitive" nature of the arbitration sought, these findings come to us with a presumption of correctness absent a preponderance of evidence to the contrary Tenn.R.App.P. 13(d); *T.R. Mills Contractors v. WRH Enterprises, LLC et al.,* 93 S.W.3d 861, 864 (Tenn.Ct.App.2002).

A. Enforceability

Because the parties, as well as the trial judge, relied on the U.S. Supreme Court's decision in *Green Tree Financial v. Randolph*, this case must be reviewed as a starting point for the analysis of enforceability. "[W]e . . . address the question whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to affirmatively protect a party from potentially steep arbitration costs. We conclude that an arbitration agreement's silence with respect to such matters does not render the agreement unenforceable." *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 82 (2000).

*Green Tree* involved a financing agreement for a unit of manufactured housing. This agreement included an arbitration clause that did not affirmatively disclose the costs of arbitration to the consumer. Randolph, the consumer, sued the lenders in U.S. District Court in Alabama, alleging violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*., and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-91(f). From the District Court's order compelling arbitration, (*Green Tree Financial Corp. v. Randolph,* 991 F.Supp. 1410 (M.D. Ala. 1997)), Randolph appealed to the Court of Appeals for the Eleventh Circuit, *Randolph v. Green Tree Financial Corp.*, 178 F.3d 1149 (11th Cir. 1999) arguing that the arbitration provision made arbitration an illusory remedy due to the unknown costs of arbitration. From the Eleventh Circuit Opinion reversing in part, Green Tree obtained *certiorari*. In its review, the Supreme Court began with a familiar starting point. Any inquiry regarding the enforceability of an arbitration agreement starts with the now well-settled purpose behind the Federal Arbitration Act. *See* 9 U.S.C. § 2:

Section 2 of the FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a

controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 USC § 2 [9 USCS § 2]. In considering whether respondent's agreement to arbitrate is unenforceable, we are mindful of the FAA's purpose "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 114 L.Ed.2d 26, 111 S.Ct. 1647 (1991).

*Green Tree Financial Corp.*, 531 U.S. at 89.

In a five-to-four decision on the issue, the Supreme Court held that silence as to costs of arbitration did not render the clause unenforceable. "It may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration."*Green Tree Financial Corp.*, 531 U.S. at 90.

The dissent recognized the dearth of information in the record when proposing an alternate resolution of the issue.

On the matter the Court airs in Part III, *ante*, at 89-92, 148 L.Ed.2d, at 382-384 — allocation of the costs of arbitration — I would not rule definitively. Instead, I would vacate the Eleventh Circuit's decision, which dispositively declared the arbitration clause unenforceable, and remand the case for closer consideration of the arbitral forum's accessibility.

*Green Tree Financial Corp.*, 531 U.S. at 93-4. (Ginsberg, J., dissenting)

The Tennessee Supreme Court has recognized the enforceability of arbitration agreements under Tennessee's version of the Uniform Arbitration Act:

Tennessee has adopted a version of the Uniform Arbitration Act. Tennessee's version, like the Uniform Act, is general in its terms and does not specifically include physician-patient agreements. Tennessee has, however, not chosen to enact a specific statute governing arbitration agreements between health care providers and patients.

With respect to enforcement, the Tennessee Act provides:
A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

-15-

Tenn.Code Ann. § 2-5-302(a) (Supp.1995). Accordingly, under the terms of the statute, arbitration agreements generally are enforceable unless grounds for their revocation exist in equity or in contract law.

*Buraczynski v. Eyring, et al.*, 919 S.W.2d 314, 318 (Tenn. 1996).

The parties in the instant case stipulate that no arbitration has taken place regarding any denial of claim alleged in the Complaint. Neither Dr. Rosenberg's affidavit nor the affidavit of Betty Prescott, an employee of Dr. Darby, states a specific aggregate amount of denied claims. Upon reviewing the Prayer for Relief, it becomes clear that, for the purpose of justifying a class action certification or a claim under the Tennessee Consumer Protection Act, doctors Darby and Rosenberg argue that their damages are great indeed, and that broad injunctive relief should be granted. However, for the purpose of unconscionable effect of the agreement, the doctors assert that their claims are of minimal value, even if aggregated over two years. Of particular concern are the arbitration cost splitting arrangements and remedy limitation provisions in the agreement. We note the same dearth of authority in Tennessee, as did the trial court. Looking to other jurisdictions addressing the issue of the alleged unconscionability of split arbitration fee provisions in a contract requiring arbitration reveals that much is dependent on the type of case which is in issue and the particular fee-splitting arrangement.

The trial court heavily relied on *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549 (4th Cir. 2001). That case involved an employee charging his employer with age discrimination in violation of the "Age Discrimination in Employment Act of 1967, § 2 *et seq.*, 29 U.S.C.A. §621 *et seq.*" This case has a rather unusual history in that the employee first demanded arbitration by petition filed February 12, 1998, and, while the arbitration claim was pending, filed suit on September 23, 1998 in the United States District Court for the Eastern District of North Carolina asserting the same claims as were before the arbitrator. The case was tried in arbitration on May 17 and 18, 1999. The District Court on July 30, 1999 granted Rockwell's Motion for Summary Judgment concluding that Bradford had failed to meet his burden of demonstrating that the arbitration agreement was unenforceable against him because he had failed to offer any competent evidence that the fee splitting would cause him financial hardship. On October 20, 1999, the arbitrator ruled against Bradford and dismissed his claims, but in the meantime, on August 27, 1999, Bradford had appealed the District Court's summary judgment. Thus, the only issue before the Fourth Circuit Court of Appeals was his claim that the fee-splitting provisions of the contract, relative to arbitration, deprived him of an adequate forum.

Following an extensive discussion, the Court held:

Our conclusion that the proper inquiry is a case-by-case analysis rather than a per se rule is bolstered by the Supreme Court's recent decision in *Green Tree Financial Corp.-Alabama v. Randolph,* --- U.S. ----, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). In *Green Tree,* the Court addressed whether an arbitration agreement that does not mention arbitration costs and fees is unenforceable because it fails to

affirmatively protect a party from potentially steep arbitration costs. *Id.* at 517. In resolving this question, the Court recognized that [i]t may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. *Id.* at 522. The Court noted, however, that the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter. *Id.* Accordingly, the Court stated that

> [t]he record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. *The risk that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement. To invalidate the agreement on that basis would undermine the liberal federal policy favoring arbitration agreements.* It would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration.

*Id.* (internal quotation marks and citations omitted and emphasis added).

The Court further stated that "[w]e have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue. Similarly, we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden." *Id.* (internal citations omitted). In other words, the *Green Tree* Court rejected Randolph's argument because Randolph could not satisfy her burden of establishing that she was likely to incur prohibitive costs that would deter her from arbitrating her claims. We believe that the *Green Tree* Court's focus on each individual claimant's burden of proving that the claims at issue are unsuitable for arbitration, its emphasis on Randolph's inability to show that she was in fact likely to incur prohibitive costs, and its refusal to nullify the arbitration agreement based upon an abstract and speculative risk that the claimant might, under some circumstances, incur prohibitive costs, is significant. *Id.* The *Green Tree* Court's refusal to accept the speculative risk that a claimant might incur prohibitive costs undermines the rationale of those courts that would impose a per se prohibition against an arbitration provision that might impose prohibitive costs against an individual on the theory that any such risk of prohibitive costs, even if that risk is entirely uncertain, surely deters the bringing of arbitration.

*Bradford v. Rockwell Semiconductor Systems, Inc.*, 238 F.3d 549, 556-57 (4th Cir. 2001).

In an *en banc* opinion, the majority of the Sixth Circuit Court of Appeals in *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003) restricted the *Bradford* approach and introduced something of a class action type inquiry.

**B. Revised Case-by-Case Approach**

We hold that potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum. Our approach differs from the case-by-case approach advocated in *Bradford* by looking to the possible chilling effect of the cost-splitting provision on similarly situated potential litigants, as opposed to its effect merely on the actual plaintiff in any given case. This difference in approach is premised on *Gilmer,* which held that [s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function. 500 U.S. at 28, 111 S.Ct. 1647 (quotation omitted). As *Gilmer* makes clear, federal anti-discrimination statutes play both a remedial and deterrent role. Although the former role is largely a matter of the rights of particular aggrieved individuals, the latter is a question of broader social purposes. *Id.* The deterrent function of the laws in question is, in part, that employers who engage in discriminatory practices are aware that they may incur liability in more than one case. If, however, a cost-splitting provision would deter a substantial number of potential litigants, then that provision undermines the deterrent effect of the anti-discrimination statutes. Thus, in order to protect the statutory rights at issue, the reviewing court must look to more than just the interests and conduct of a particular plaintiff. A particular plaintiff may be determined to pursue his or her claims, regardless of costs. But a court considering whether a cost-splitting provision is enforceable should consider similarly situated potential litigants, for whom costs will loom as a larger concern, because it is, in large part, their presence in the system that will deter discriminatory practices. Nothing in *Green Tree* suggests that a case-by-case analysis should not treat similar cases similarly.

For this reason, if the reviewing court finds that the cost-splitting provision would deter a substantial number of similarly situated potential litigants, it should refuse to enforce the cost-splitting provision in order to serve the underlying functions of the federal statute.

317 F.3d at 663 (6th Cir.2003).

Both *Bradford* and *Morrison* are age discrimination cases based on federal civil rights statutes. *Bradford* strictly follows, as to the cost-splitting provisions of an arbitration agreement, the individualized mandates of *Green Tree*. *Morrison* adds an element that in federal civil rights cases strips the analysis of its individualized component and asserts an element involving deterrence of potential claimants similarly situated.

*Morrison* is not applicable to the case at bar for reasons stated by the Sixth Circuit Court of Appeals in *Stutler v. T.K. Constructors, Inc.* 448 F.3d 343 (6th Cir.2006). That case did not involve

-18-

federal civil rights statutes. The claimants asserted state law claims relative to misrepresentation and breach of contract with federal jurisdiction based upon diversity of citizenship. The Court held:

> The district court erred by applying federal common law rather than considering state law contract defenses. Specifically, the court relied on our holdings in *Cooper v. MRM Investment Co.* and *Morrison v. Circuit City Stores, Inc., supra.*
>
> We clearly limited our holdings in *Morrison* and *Cooper* to the validity of arbitration clauses in employment agreements where an employee's statutorily created federal civil rights are at issue. *Morrison*, a Title VII employment discrimination case, held that an arbitration clause may be unenforceable if the cost of arbitration would undermine "the purposes of federal anti-discrimination legislation" by deterring potential claimants from pursuing their claims. According to *Morrison*, the resolution of an arbitral civil rights dispute must "reconcile the liberal federal policy favoring arbitration agreements with the *important rights created and protected by federal civil rights legislation.*" *Id.* at 652-53 (quotation omitted) (emphasis added). Toward that end, *Morrison* provides that "potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate *their federal statutory rights* in the arbitral forum." *Id.* at 663 (emphasis added). *Cooper*, a second Title VII employment discrimination case, also upheld a district court's refusal to enforce an arbitration clause where the cost of arbitration was prohibitive. 367 F.3d at 510-12. *Cooper* explicitly held that the objective of its cost deterrent analysis was "to serve the underlying functions of the federal statute." *Id.* at 511 (quoting *Morrison*, 317 F.3d at 663).
>
> A third case is relevant. *Green Tree Financial Corp. v. Randloph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), a predecessor to *Morrison* and *Cooper*, dealt exclusively with the arbitration of federal statutory claims. In that case, the Supreme Court held that invalidation of an arbitration agreement on the basis that arbitration was cost-prohibitive was in error where the agreement was silent as to how the plaintiff and the defendant would share the costs. *Id.* at 91-92, 122 S.Ct. 513. The Court wrote that the plaintiff in such a case bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue and that the plaintiff is likely to suffer the costs of arbitration. *Id.* at 92, 121 S.Ct. 513.
>
> *Green Tree, Morrison* and *Cooper* are limited by their plain language to the question of whether an arbitration clause is enforceable where federal statutorily provided rights are affected. In this case, no federally protected interest is at stake. The Stutlers, through diversity jurisdiction, seek to enforce contractual rights provided by state law. As a result, *Morrison* and *Cooper* simply do not apply. Under

the FAA, the Stutlers must look to contract defenses available in Kentucky rather than those found in federal common law.

*Stutler v. T.K. Constructors, Inc.*, 448 F.3d 343, 345-46 (6th Cir.2006).

The jurisdictional allegations of the complaint at bar state:

Plaintiffs DeWayne P. Darby, M.D. and Zachary Rosenberg, M.D., by their attorneys, bring this action pursuant to the Tennessee Consumer Protection Act of 1977, Tenn.Code Ann. § 47-18-101, *et seq.*, and other statutory and common law, against BlueCross BlueShield of Tennessee, Inc. and Tennessee Health Care Network, Inc. (collectively referred to herein as "BCBS-TN"), and allege the following upon information and belief, except as to paragraphs pertaining to plaintiffs' own actions, which are alleged upon personal knowledge:

## INTRODUCTION

1. Plaintiffs bring this action on their own behalf and on behalf of a class (the "Class") of all physicians who are members of the Tennessee Medical Association ("TMA") and who are, or were, participating physicians in defendants' physician network ("TMA members") at any time during the period from April 25, 1996 through the present (the "Class Period"). Plaintiffs do not bring this action as assignees of enrollees' benefits. Moreover, the action does not otherwise seek benefits or other remedies under the Employment Retirement Income Security Act of 1974 ("ERISA"), the Federal Employee Health Benefits Act ("FEHBA") or the Medicare Act of 1965, nor does it arise under or relate to these acts.

. . .

## JURISDICTION AND VENUE

13. The claims alleged herein arise under the Tennessee Consumer Protection Act of 1977, Tenn.Code Ann. § 47-18-101, *et seq.*, and other statutory and common law.

14. This Court has jurisdiction over BCBS-TN because BCBS-TN does sufficient business in Tennessee, has sufficient minimum contacts with Tennessee, including offices located here, and otherwise intentionally avails itself of the markets in Tennessee by establishing and maintaining physician networks and administering healthcare plans with thousands of subscribers in Tennessee, and by promoting, marketing, selling and distributing its healthcare services in this state, so as to render the exercise of jurisdiction by the Tennessee courts permissible under traditional notions of fair play and substantial justice.

-20-

15.    This Court is a proper venue for this action pursuant to Tenn.Code § 16-10-101, *et seq.*, because BCBS-TN conducts a substantial amount of its business in Davidson County, Tennessee, has numerous participating physicians in this district, and provides healthcare products and services to numerous Davidson County residents.  Moreover, it is the chosen forum of the named plaintiffs.

Even though *Bradford* was a federal civil rights case, it followed as to the cost-splitting provisions in an arbitration agreement the individualized treatment that was determined in *Green Tree*.  For reasons articulated in *Stutler*, *Morrison* is not applicable to the case at bar.  Thus, the trial court's reliance on *Bradford* is well placed.  The claims, as Rosenberg and Darby clearly state in their jurisdictional allegations, are based entirely upon Tennessee's statutory and common law.

In the final analysis, the Eighth Circuit Courts of Appeals has correctly articulated the *Green Tree* requirements:

> A fee-splitting arrangement may be unconscionable if information specific to the circumstances indicates that fees are cost-prohibitive and preclude the vindication of statutory rights in an arbitral forum.  *See Green Tree*, 531 U.S. at 90, 121 S.Ct. 513; *Dobbins*, 198 F.3d at 717.  The burden of showing that arbitrators' fees will be cost-prohibitive falls on the party seeking to avoid arbitration.  *Green Tree*, 531 U.S. at 92, 121 S.Ct. 513.  The Supreme Court has not established what quantum of proof is necessary to meet that burden.  *Id.*  We require more than just a hypothetical inability to pay, however, to overcome the federal policy favoring arbitration.  *See Dobbins*, 198 F.3d at 716-17.  The party seeking to avoid arbitration should present specific evidence of likely arbitrators' fees and its financial ability to pay those fees so that the court can determine whether the arbitral forum is accessible to the party.  If the party does not meet its burden, the district court must honor the arbitration agreement and compel arbitration.

> Faber failed to meet his burden of proof that the arbitrators' fees make the agreement unconscionable due to their prohibitive cost.  The amount of the arbitrator's fees is not well-defined in the contract, and Faber has not provided the evidence necessary to estimate the length of the arbitration and the corresponding amount of arbitrators' fees (e.g. sophistication of the issues, average daily or hourly arbitrator costs in the region).  He has also failed to provide evidence of his particular financial situation.  Rather, Faber merely argues that the requirement that he pay half of the arbitrators' fees in unconscionable because it is a cost he would not pay in litigation and therefore discourages him from bringing his claims.  Without the specific evidence, however, this hypothetical discouragement is purely speculative.  *See Green Tree*, 531 U.s. at 92, 121 S.Ct. 513; *Blair*, 283 F.3d at 610.

*Faber v. Menard, Inc.*, 367 F.3d 1048, 1053-54 (8th Cir.2004).

Except for the fee-splitting provisions of the contract relative to arbitration, all of the issues between the parties in this case are foreshadowed if not foreclosed by the opinion written for this Court by Judge Swiney in *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351 (Tenn.Ct.App.2001).[2]

*Pyburn* was an action based on the Tennessee Consumer Protection Act and a motion by the Defendant to compel arbitration. The trial court held that the Federal Arbitration Act applied, that Tennessee Consumer Protection Act claims in general were amenable to arbitration under the Federal Act and that the contract was not an unenforceable adhesion contract. The trial court held, however, that the particular agreement was not enforceable because of the unavailability of class action or injunctive relief in the arbitral forum and because the costs of arbitration were potentially prohibitive since Plaintiff's claims were so small. On appeal, this Court reversed the trial court holding of nonenforceability of the arbitration provisions and otherwise affirmed the trial court. It should be noted that at the time of the appeal, while class action certification was sought, there had been no such certification by the trial court.

After rejecting Plaintiff's argument that the Tennessee Consumer Protection Act provisions barred his waiver of a right to a judicial forum, and holding that such argument was preempted by the Federal Arbitration Act under *Southland Corp. v. Keating*, 465 U.S.1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (*See* 63 S.W.3d at 361), this Court addressed the question "Whether the costs associated with arbitration render the arbitration agreement unenforceable." This Court followed *Green Tree* and held that Pyburn had failed to carry his burden of proof relative to prohibitive costs of arbitration. The Court then left open the question presented in the case at bar by holding, "Our conclusion might be different had the agreement prohibited shifting of these costs or contained some language requiring Plaintiff to be responsible for all or a disproportionate share of the costs of arbitration, but that is not the situation here." 63 S.W.3d at 363.

With this insight into controlling law, we now address the specific complaint in this case and what the record before the Court discloses as to the cost of arbitration versus the cost of litigation.

Since *Pyburn* clearly holds that claims under the Tennessee Consumer Protection Act are subject to arbitration and that "to the extent that TCPA prohibits arbitration because it is an unlawful waiver of Plaintiff's right to proceed in a judicial forum, the TCPA is preempted by the FAA.", the issues before the Court can just as readily be submitted to arbitrators as they can be submitted to a judicial forum.

In addressing the scope of the plaintiffs' complaint, the trial court observed in its February 3, 2005 Order:

In the case at bar, the [plaintiffs] do not specifically address the costs of arbitrating this case – a law suit alleging numerous and systematic deceptive acts, breaches of

---

[2]*Pyburn* was decided by this Court on May 9, 2001. Application for permission to appeal was denied and publication recommended by the Supreme Court on November 19, 2001.

contracts, failures to promptly pay and unjust enrichment. Instead, the plaintiffs argue that the costs of arbitrating each individual claim of a physician for underpayment or reimbursement which claims are the wrongful and deceptive acts that make up and constitute some of the facts and evidence of this lawsuit, is cost prohibitive such that the physicians do not have a viable forum or remedy to redress these small claims.

The trial court lays bare the problem facing the plaintiffs in this case in trying to prove that arbitration is cost prohibitive. If in fact their complaint sought to redress small claims of Drs. Rosenberg and Darby, which claims aggregated $4,000 over a period of two years, it would be easy enough to say on very limited proof that arbitration was cost prohibitive. The complaint, however, asserts no such small claims but rather alleges a pattern of improper and deceptive conduct and business practices under which "defendants have deprived TMA members of millions of dollars of lawful reimbursement for healthcare services provided to defendant's plan members." This is but a small portion of the extensive complaint which includes a prayer for punitive damages, attorneys' fees, expert witness fees and permanent injunctive relief very broad in scope. What might be prohibitive when a $4,000 claim is in issue would certainly not be prohibitive when millions of dollars and vast injunctive relief are actually in issue. It is in this area that Plaintiffs failed to meet their burden of proof. When one considers that the factual allegations of the complaint have nothing to do with small claims but much to do with major and extensive litigation, it is apparent that the costs of resolving such a controversy will be extensive and expensive regardless of whether the forum is arbitral or judicial. The contract in issue provides, "H. ALL DISPUTES WILL BE SUBJECT TO BINDING ARBITRATION." Both *Green Tree* and *Pyburn* reiterate the strong federal policy favoring arbitration and cast the burden of proof upon the party seeking to invalidate the arbitration agreement. 63 S.W.3d at 363. The record before the Court contains no attempt to quantify the costs of arbitration of the far-reaching claims alleged in the complaint.

The trial court held in its February 3, 2005 Order in pertinent part

1.  . . . this lawsuit is not a small claim.
2.  Ultimately, the plaintiffs have not presented evidence to this court of the costs of arbitrating the above-captioned lawsuit.
3.  This court, therefore, concludes that the plaintiff physicians have failed to demonstrate that the costs of arbitrating the above-captioned lawsuit is prohibitively more expensive than a judicial forum.

In granting Plaintiff's Motion for a Rule 9 Interlocutory Appeal, the trial court held:

There is very little law in Tennessee developing and interpreting the *Green Tree Financial Corp.-Ala. v. Randolph*, 531 U.S.79 (2000) exception to arbitration where the arbitration is cost prohibitive. Because of this absence of law in Tennessee and on that basis alone, the Court grants the interlocutory appeal. This Court is

-23-

convinced it has correctly decided this case, applying the *Green Tree Financial* standard and cases from other jurisdictions.

We agree with the trial court as to this issue.

In granting the interlocutory appeal, we expanded the issues so as to include the issues of whether the arbitration clauses are part of a contract of adhesion and whether the defendant's substantial market share is a factor to be used in evaluating the relative bargaining power of the parties to an arbitration agreement.

The trial court, relying primarily on *Buraczynski v. Eyring*, 919 S.W.2d 314 (Tenn.1996), held that the contract in issue is not a contract of adhesion and that BCBST's alleged 20 to 40 percent (20 - 40%) Tennessee market share is not a factor to be used in evaluating the relative bargaining power of the parties. In these holdings, we find the trial court's analysis to be correct. *Buraczynski* involved a doctor/patient contract requiring arbitration of a medical malpractice dispute under the Tennessee Arbitration Act. The Supreme Court held under the facts of that case that the contract was a contract of adhesion. However, the Court further held:

> Our conclusion that the contracts were contacts of adhesion is not, however, determinative of the contract's enforceability. Enforceability generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable. *Broemmer*, 840 P.2d at 1016. Courts will not enforce adhesion contracts which are oppressive to the weaker party or which serve to limit the obligations and liability of the stronger party. *Id.*

919 S.W.2d at 320.

The contracts at issue in this case are not physician/patient contracts, but rather contracts between two practicing physicians and a major health maintenance organization and preferred provider organization which provides healthcare services for its enrollees.

In the case at bar, even if we were to hold the contracts to be contracts of adhesion, such would not satisfy the *Buraczynski* test that such contracts must be "beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." 919 S.W.2d at 320. The primary case relied upon in *Buraczynski* justifying a finding of oppressive or unconscionable character of the contract is *Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 840 P.2d 1013 (Az.1992), a case in which the arbitration provisions were contained in a clinic admission form and which required the arbitrators to be physicians specializing in obstetrics and gynecology.

Analyzing the record in this case under *Burzczynski* and under *Vickery Transportation, Inc. v. Hepaco, Inc.*, 2004 WL 2280421 (Tenn.Ct.App.2004) and *Wilson Pharmacy, Inc. v. General Computer Corp.*, 2000 WL 1421561 (Tenn.Ct.App.2000) the contracts at bar are not "beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable" even if market share

is properly considered as a factor in the analysis. The trial court correctly held that neither market share nor an argument that the contract was one of adhesion coupled with oppressive and unconscionable factors can withstand the *Buraczynski* analysis.

## CONCLUSION

More than 80 years ago, the Federal Arbitration Act of 1925 reversed the common law rule that frowned upon arbitration. Subsequent case law over those eight decades favors arbitration. A party challenging the arbitration provisions of a contract, particularly when those provisions are clear and unambiguous, faces a figurative tsunami of case law, both federal and state, ever strengthening and reenforcing the favored status of arbitration. Although lawyers or judges may long for the nostalgic challenges of combat in a judicial forum, nothing save federal legislative intervention can stem the tide of *Moses H. Cone Memorial Hosp. v. Mercury Const. Co.*, 460 U.S. 1 (1983), *Southland Corp. v. Keating*, 465 U.S.1 (1984), *Gilmer v. Interstate Johnson/Lane Corp.*, 500 U.S. 20 (1991), *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265 (1995), *Green Tree Financial Corp.-Ala. v. Randolph*, 531 U.S.79 (2000) and *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351 (Tenn.Ct.App.2001). The common law rule asserting the superiority of judicial forum over an arbitral forum was swept into history by the Federal Arbitration Act. Parties cannot be forced to arbitrate that which they do not agree to arbitrate. *Frizzell Constr. Co., Inc. v. Gatlinburg, LLC*, 9 S.W.3d 79 (Tenn.1999), but when the parties agree to arbitrate, the federal policy strongly favoring arbitration which policy was imposed upon state courts by *Southland* overrides all conflicting considerations. *Pyburn*, 63 S.W.3d at 357.

The judgment of the trial court is in all respects affirmed, and costs are assessed to Appellants.

———————————————————————
WILLIAM B. CAIN, JUDGE